JAMES LAY, plaintiff in error, *vs.* ALVIN K. SEAGO, defendant in error.

1. A deed to land given by an insolvent debtor to a creditor in trust to secure the payment of his debt, which deed provides that if the debt is not paid in four months the creditor may sell the land at public outcry, and reimburse himself out of the proceeds for his debt, cost and expenses, and that he is "to pay the balance, if any there is," to the grantor, is not, on account of such provision for payment of the balance, void under section 1942 of the Code. The law would give that direction to the balance without the provision.

2. An accommodation acceptance of a bill of exchange for a commission, to enable the drawer to raise money by discounting it, where commission and discount amount to more than legal interest, is not *per se* usurious on the part of the acceptor. In a suit by the acceptor against the drawer, to recover the amount which he alleges he had to pay on

Lay *vs.* Seago.

.his acceptance, whether this method was used as a cloak for usury or not, is a question of fact for the jury. If the acceptor was the real lender, it would be usury; but if the transaction was a *bona fide* sale of credit, it would not. The Judge in this case, to whom was referred questions of law and fact, having found the transactions untainted with usury, which finding is supported by evidence, this Court will not disturb the judgment.

3. If a surety on a contract originally usurious, pays it, and in payment includes the usury, he is entitled to recover it of his principal, unless previous to the payment he had notice of the intention of the principal to resist the usury: Code, section 2136.

Conveyance by insolvent. Accommodation acceptance. Commissions. Usury. Principal and surety. Before Judge PARROTT. Gordon Superior Court. February Term, 1872.

David B. Barrett, as administrator of Azariah P. Bailey, deceased, filed a bill against Alvin K. Seago, James Lay and others, creditors of his said intestate, to marshal the assets of the estate. The master appointed to audit the claims against said intestate reported that said Seago held a valid claim for $1,580 41, with interest thereon from December 13th, 1866, and that, by virtue of a deed dated July 19th, 1866, made by said Bailey to said Seago, he held a lien, in the nature of a mortgage, on lot of land number one hundred and seventy-eight, of the 15th district of the 3d section of Gordon county, and was entitled to be paid out of the proceeds of said land when sold.

James Lay filed the following exceptions to said report, to-wit:

1st. Because said deed was void, being for a usurious consideration.

2d. Because said deed was void, being a conveyance by a debtor, insolvent at the time, reserving a trust for the benefit of the grantor.

3d. Because a part of said claim was for usury, paid by said Seago, with a knowledge that it was usury.

Seago joined issue upon these exceptions, and the questions of law and fact, by consent, were submitted to the decision of the Court without the intervention of a jury.

Seago introduced the report of the master and closed.   Lay read the answer of said Seago to a bill filed against him by said Barrett as administrator, in which were the following statements: That on or about July 19th, 1866, Bailey applied to Seago to become his factor and business agent in Atlanta for the sale of the produce of said Bailey's mills in Gordon county, and represented that, in order to prosecute his business, it was necessary for him to have the use of from $1,500 00 to $2,500 00 with which to purchase wheat, to be ground into flour and sent to the Atlanta market, and that he desired to borrow said sum of money from Seago; that Seago did not have the money, but agreed to employ his credit and give his personal attention to negotiating a loan for said Bailey, upon the express condition that said Bailey was to send the flour made at said mills, from the wheat purchased with said money, to Seago, at Atlanta, to be by him sold at customary rates and commissions, and that, for the risk which Seago was to run in becoming personally liable for the debt, he was to receive customary rates with other business men of the city of Atlanta for like risk and serving; that, by resolution of the Board of Trade of Atlanta, to which the business men conform, it was provided that factors and commission merchants of said city are to charge two and a half per cent. for every accommodation acceptance or renewal of the same, all of which was fully explained to said Bailey and agreed to by him; that, in accordance with the agreement, said Bailey drew an inland bill of exchange on Seago, in favor of the Georgia National Bank, at thirty days, for $1,500 00, and upon this bill, when accepted by Seago, the bank paid the money to Bailey; that, upon being informed by Bailey that he would want, probably, as much as $2,500 00, and renewals of the paper to the extent of four months, Seago requested that security be given to compensate for increased risk, in addition to the proposed consignments of flour; that said Bailey, in accordance with said request, executed a deed to Seago to the property already described, containing the following condition:

"But this deed is made for the following uses and trusts,

and for no other purposes—that is to say, that I am indebted to said Seago in the sum of $2,500 00, by account. Now, if I should pay the said debt, that is to say, the account for the sum aforesaid, at the expiration of four months from this date, then this deed to be void; but if I should not, then the said A. K. Seago, as trustee, after giving thirty days' notice of the time and place of sale in one of the public newspapers published in Atlanta, may expose said land to public sale at the Court-house door in the county of Gordon, between the usual hours of sale, that is, from ten o'clock A. M. to three o'clock P. M., and sell it to the highest bidder for cash, and appropriate the proceeds, first, to the payment of the necessary expenses and costs; secondly, to the satisfaction of said debt so due said A. K. Seago, as aforesaid; thirdly, to pay the balance, if any, to me."

That the first bill of exchange was drawn on July 19th, 1866, for $1,500 00, at thirty days, four times renewed at thirty days and paid by Seago; that a second bill of exchange was drawn on August 4th, 1866, for $500 00, at thirty days, three times renewed at thirty days and paid by Seago; that Bailey shipped only one hundred and twenty-five sacks of flour, which sold for the gross sum of $977 00; deducting from this gross amount charges for freights and other expenses, charges, commissions, insurance, and the premiums due Seago for negotiating and accepting said bills of exchange, together with $166 83 paid to the bank, by Bailey's instructions, for the use of the money, and allowing an account for one hundred and thirty-seven wheat sacks sold Bailey, $54 10, leaves $420 00 to be appropriated to said indebtedness, leaving still due, $1,580 00, with interest from December 13th, 1866; that, as to Seago, there was nothing usurious or otherwise illegal in the transaction; that the bank loaned its own money to Bailey, and Seago had no interest in the same; that, by being compelled to pay the drafts, his losses will exceed any profits appearing to have been made.

The evidence being closed, the Court decided that said deed was a legal and valid mortgage, creating a lien on said lot of

land; that there was no usury in the transaction, and ordered that the report of the master be confirmed.

To which ruling James Lay excepted, and now assigns the same as error.

FAIN & McCONNELL; D. A. WALKER, by brief, for plaintiff in error.

W. H. DABNEY, for defendant.

MONTGOMERY, Judge.

1. Was the deed from Bailey to Seago void, under sections 1942 and 1943, of the Code, on account of the provision in it for a return of the surplus left, if any, to Bailey after sale of the property, and payment of the debt to Seago which might arise from his having to take up the drafts. In the case of *Cary vs. Giles*, 10 *Georgia*, 28 to 35, Judge Nesbit says: "We know of no law of force in Georgia, which condemns as fraudulent and void a transfer made by a failing or insolvent institution, (the Bank of Macon) in payment 'of a just debt, because the amount transferred is larger than is reasonably sufficient to pay that debt, with an agreement between the parties that the surplus shall be returned to the transferee—none whatever. On the contrary, in our judgment, the law approves just such a transaction, and will sustain it." "By operation of law the excess reverts to the assignor, and in his hands is as much liable to his other creditors as it ever was, and it is also liable in the hands of the assignee to these (objecting) creditors in equity; indeed, in Georgia, it can be reached at law by our process of garnishment."

This decision was made under the Act of 1818. A comparison of this Act with sections 1942 and 1943 of the Code, will show that the provisions of the Act of 1818, (T. R. R. Cobb's Digest, 168) are much more stringent against transfers of property by insolvent debtors to secure favored creditors than are the sections of the Code referred to. If a deed of assignment like the one under review would have been valid

Lay *vs.* Seago.

under the Act of 1818, as decided in 10 *Georgia, a fortiori* is it valid under the Code? The present case is stronger than that in 10 *Georgia,* in this: it secures Seago, and indemnifies him against risk to be incurred in consideration of the making of the deed, Seago thus giving, at the time, a valuable consideration for the deed, making it in effect a mortgage to secure future advancements: Code, 1953. And this would have saved it from the operation of the Act of 1818: *Carter vs. Neal,* 24 *Georgia,* 353. The case in 10 *Georgia* was a transfer of property to secure an old debt—no new consideration moving at the time from the transferee to the transferer. The case is reviewed and affirmed in *Banks vs. Clapp,* 12 *Georgia,* 514. So far as these cases interpret the Act of 1818, however, they may be said to be overruled by *Miller vs. Conklin & Company,* 17 *Georgia,* 430; *Norton vs. Cobb,* 20 *Georgia,* 44; *Watkins vs. Jenks,* 24 *Georgia,* 431, and *Lamb & Mathis vs. Radcliff,* 28 *Georgia,* 520. It is a little remarkable that none of these cases refer to Carey *vs.* Giles, which was a case considered by Judge Nesbit, in his usual careful and elaborate style, the point now under consideration receiving especial attention at his hands. Whatever then may have been the correct interpretation to be placed upon the Act of 1818, we think there can be very little doubt on this question under the Code. Indeed, the enlarged powers given to an insolvent in the disposition of his property, as contained in the Code, would seem to have been there inserted with a view of reconciling the conflicting opinions of the Supreme Court. However that may be, we find the Code providing that in cases of this character "a *bona fide* transaction, on a valuable consideration, and without notice or grounds for reasonable suspicion, shall be valid;" and "a debtor may prefer one creditor to another, and to that end he may *bona fide* give a lien by mortgage or other legal means," etc., "the surplus in such cases not being reserved for his own benefit," etc., "to the exclusion of other creditors." The sections of the Code from which these quotations are made alters the Act of 1818, and makes that legal now, which the later decisions hold to be

illegal under that Act: *Embry & Fisher vs. Clapp*, 38 *Georgia*, 249; *Rowland vs. Coleman*, March 5th, 1872. Is the surplus in the case before us "reserved" for the benefit of Bailey? Reserved means kept back, retained, withheld: Zell's Encyclopædia. The grantee in the case before us is to reserve nothing for the benefit of the grantor, but after paying his own debt returns the surplus where the whole originally was, subject, as the whole was, to the demands of the grantor's creditors. In short, we understand the statute to mean that there shall be no attempt by the assignment or transfer to cover up any portion of the debtor's property in trust for him, or in any way for his benefit, or of any other favored creditor, so that it may not be reached by his other creditors, should they elect to pursue it for the payment of their own claims. Our judgment is, that the second exception to the master's report is not well taken.

2. Is an accommodation acceptance of a bill of exchange for a commission, to enable the drawee to raise money by discounting it, where commission and discount amount to more than legal interest, *per se usurious* on the part of the acceptor? Here we are met with conflict of opinion. Without entering into an elaborate argument in favor of the position assumed by the Court, it will be sufficient to refer . to the case of Ketchum *vs.* Barber *et al.*, 4 Hill, (New York Reports,) 224, in support of the doctrine which we have laid down. Both sides of the question are very ably presented in that case by Nelson, Chief Justice, in delivering the opinion of the Court, and by Mr. Justice Cowen in his dissenting opinion, and the authorities reviewed. Upon the whole, we see no conclusive reason why the case of an accommodation acceptor should stand upon a footing different from the thousand and one devices that the ingenuity of man has resorted to for the purpose of evading the usury laws. If it *be* a device, and the accommodation acceptance is only colorable, it is usury; if not, not. "It depends principally on the contract being a *loan;* and the statute uses the words 'directly or indirectly ;' therefore, in all questions, in whatever respect, repugnant to the statute, we

Lay *vs.* Seago.

must get at the nature and substance of the transaction; the view of the parties must be ascertained to satisfy the Court that there is a loan, and borrowing, and that the substance was to borrow on the one part and to lend on the other; and where the real truth is a loan of money, the wit of man cannot find a shift to take it out of the statute:" Lord Mansfield in Floyer *vs.* Edwards, Cowp., 112. To find out what is "the real truth," the jury is the appropriate tribunal to inquire of, and the question should be submitted to them under the charge of the Court, that if the transaction was resorted to, to evade the usury laws, the taint attaches, if it is a *bona fide* sale of credit to enable the drawer to borrow money of another, it is not usurious.

3. The last exception to the master's report is, in our judgment, untenable in the face of section 2136 of the Code; whether the bank forfeited the interest, under the banking law of Congress of 1864, (2 Brightley's Digest, 58,) or whether the bank could have recovered on the bills, under sections 1480, 1478 of the Code, is not the question. Bailey, or his administrator, permitted the bills to be paid by Seago without notifying him that the claim would be resisted on the ground of usury. If the fact that the bills were void, under sections 1480 and 1478 of the Code, or that the interest was forfeited under the Act of Congress, must now deprive Seago of his right to recover, as contended, then, in no case, can a surety recover usury of his principal which he has paid. The effect of *all* usury is to annul and make void the contract for the usury: Code, 2025. In what case, then, is section 2136 applicable?

Judgment affirmed.