FECHHEIMER *et al. v.* BAUM *et al.*

*(Circuit Court, S. D. Georgia, W. D. July, 1890.)*

1. ASSIGNMENT FOR BENEFIT OF CREDITORS—WHAT CONSTITUTES—MORTGAGE.

Under Code Ga. § 1953, which provides that a debtor may prefer one creditor to another, where a mortgage is given by an insolvent debtor to one of his creditors on all his property, and is followed immediately by other mortgages which in effect constitute a general assignment for creditors, the first mortgage does not constitute part of the assignment. Distinguishing *White* v. *Cotzhausen*, 9 Sup. Ct. Rep. 309.

2. SAME.

An assignment by an insolvent debtor to a creditor, who knows of his insolvency, of all his property, consisting of choses in action, in order to secure such creditor, is a general assignment for the benefit of creditors.

3. SAME.

A mortgage which provides that the surplus, after paying the mortgage debt, shall be paid to the mortgagor's creditors, constitutes a general assignment for creditors. Following *Coggins* v. *Stephens*, 73 Ga. 414.

4. SAME—REQUISITES AND VALIDITY.

An assignment for the benefit of creditors, which is not accompanied by a sworn schedule and statement of assets as required by Act Ga. Sept. 28, 1881, is void.

5. FRAUDULENT CONVEYANCE—WHAT CONSTITUTES—MORTGAGE.

The provision in a mortgage that the surplus after satisfaction of the debt shall be returned to the mortgagor does not render the mortgage fraudulent. Following *Calloway* v. *Bank*, 54 Ga. 441.

6. SAME—RECORDING.

The fact that an agreement by a debtor to prefer a certain creditor in case of insolvency is not recorded does not render it fraudulent, since such an agreement is not required by law to be recorded, and its record would therefore not constitute notice. Distinguishing *Blennerhassett* v. *Sherman*, 105 U. S. 100.

7. EQUITY PRACTICE—COSTS.

Where a subsequent creditor brings suit to set aside such agreement he will be entitled to recover costs, even though he fail in his suit, where it appears that his ignorance of the agreement caused him to give the debtor credit.

8. ATTORNEY AND CLIENT—COMPENSATION—MORTGAGE—EQUITY PRACTICE.

Where the foreclosure of a mortgage, which provides for 10 per cent. attorneys' fees, is enjoined in a suit in which a receiver is appointed to sell the property for the benefit of all interested parties, the mortgagor is entitled to recover such attorneys' fees out of the proceeds.

9. SAME.

Where a creditor has by suit brought into the custody of the court property of his debtor which had been appropriated by certain creditors to the exclusion of the others, and which the court distributes for the benefit of all the creditors, the attorneys of such creditor are entitled to compensation for their services out of the proceeds of such property. Following *Railroad Co.* v. *Pettus*, 5 Sup. Ct. Rep. 387.

In Equity.

*Patterson & Hodges, Marion Erwin,* and *C. H. Cohen,* for complainants. *Denmark, Adams & Adams* and *Hill & Harris,* for defendants.

SPEER, J. The character of this case is outlined in the decision of the court given on the application for injunction, and reported in 37 Fed.

Rep. 167. After granting the injunction and appointing a receiver, the cause was referred to the standing master, with instructions to that officer—*First.* To audit and ascertain the several liens, or alleged liens, upon the fund in the custody of the court, and to report to the court the entire amount, including principal, interest, and attorneys' fees due on each, and the relative dignity and priority of said liens. *Second.* To report to the court as to the right of Fechheimer & Co., Claflin & Co., and Gibian & Co. to a recaption of the goods sold Baum & Bro. and Baum & Co., and, if such recaption is allowed, to ascertain the particular goods upon which it is to operate, and how much of the fund there is to allow therefor. *Third.* To report also as to the claim of Comer & Co. to the uncollected notes, accounts, and choses in action now in the hands of the receivers, the title of which is claimed by Comer & Co. under an assignment of Baum & Bro. and Baum & Co. to them. *Fourth.* To take and state the accounts of all the general creditors before the court, and to report as to the amounts, if any, to be paid each. The master, after full and protracted hearing, has reported that the sales of goods made by Fechheimer & Co., by Claflin & Co., and Gibian & Co., to the Baums were legal and valid, and that the charges of fraud by which the complainants sought to rescind such sales were not sustainable from the evidence. The master further finds that the mortgage executed and delivered by Baum & Bro. and Baum & Co. to Comer & Co., dated the 13th and recorded the 20th of November, 1888, is a legal, valid mortgage, according to the Code of Georgia, and entitled to priority over all other claims; and, further, that the assignment dated November 16, 1888, by the Baums, of all their book-accounts, notes, and mortgages to Comer & Co. is a legal, valid assignment under the law of Georgia. The master concludes:

*First.* That the defendants H. M. Comer & Co. are entitled to a decree against the fund in the custody of the court for the sum of twenty-eight thousand six hundred and fifty-four dollars and thirteen cents, ($28,654.13,) the same being the principal, interest, and attorneys' fees stipulated in the mortgage which was executed by N. B. Baum & Bro. and Baum & Co., and delivered to the said H. M. Comer & Co. November 13, 1888, and recorded within the time prescribed by law. *Second.* That the remaining specialty creditors of N. B. Baum & Bro. and Baum & Co., whose mortgages are enumerated in the second class of liens, are also entitled to have and recover the full amount of their debts, with the stipulated interest and attorneys' fees. In case of a deficit in the fund in the custody of the court, then, in conformity with section 1956 of the Code, the court will distribute the proceeds to the mortgagees according to their claims, an exception to be made in favor of the minor mortgage of Dennis Doke, should the proceeds of the sale of the land subject to this lien be sufficient to satisfy its claim. *Third.* When the mortgage creditors have been paid, if a surplus remain, the simple contract creditors, the master reports, are entitled to the priority of the distribution of the surplus. The creditors who filed the original bill have no preference thereby over those who came in by intervention as parties complainant.

A number of exceptions have been filed to the report of the master, and the cause has been fully heard upon argument on the report and the exceptions thereto. In view of the importance of the cause, the

court has taken time for consideration, and, after careful inquiry, has reached conclusions which may be stated as follows: The Baums were merchants, having places of business at Irwinton and Toomsboro in this district. They had been dealing for a number of years with H. M. Comer & Co., a firm of commission merchants of Savannah. In the course of this business, and, so far as the evidence has disclosed, without any intentional fraud on the part of Comer & Co. in the negotiations which led to the arrangement, Baum & Bro. executed to Comer five notes, dated March 10, 1888, each for $3,200, bearing 8 per cent. interest from maturity, and due, respectively, September 15, October 1, October 10, November 1, and November 10, 1888; also four notes of N. B. Baum & Bro., indorsed "Baum & Co.," each for $5,000, with interest from maturity at 8 per cent., three of them dated Savannah, October 12, and one Toomsboro, November 13, 1888, and due, respectively, November 20, December 1, December 10, 1888, and January 12, 1889; and also one note of Baum & Co., indorsed "N. B. Baum & Bro.," for $2,000, with the same interest, dated March 10, 1888, and due October 20, 1888; thus making 10 notes, aggregating in all $38,000. On March 10, 1888, which, it will be observed, was of even date with several of the notes, the Baums executed to Comer & Co. a written agreement which recited that in consideration of advances to them by Comer & Co. amounting to $18,000 as evidenced by the five notes of $3,200 and one for $2,000 above mentioned, and to secure the payment of the same, the Baums agreed to deposit as collateral security notes and mortgages of good planters and others equal in amount to twice their indebtedness, and also to transfer their insurance policies to Comer & Co., and also to ship all cotton they control during the season to them, and further agreeing that all advances over the $18,000 be paid first out of the proceeds of the cotton shipments, and agreeing finally that in case they become financially embarrassed, or fail to meet the notes, they would give Comer & Co. a first lien or mortgage on all their real estate and their stock of merchandise. On December 13, 1888, the complainants filed their bill against Baum & Bro. and Baum & Co. under the statute of Georgia, (section 3149*a* of the Code,) by which it is competent for a creditor whose debt is due and unpaid to put his debtor, who is an insolvent trader, into the hands of a receiver. The bill also alleged on the part of several complainants that as to the purchase of their goods there was such fraudulent representation on the part of the Baums as to their solvency and means that it was manifest the purchase was made by the Baums without any intention of paying therefor, and as to all such goods in possession of the defendants those contract creditors prayed a rescision of the trade and recaption. On December 28, 1888, the complainants filed an amendment to their bill, in which they charge that Comer & Co. were participants in this fraudulent conduct, and that the debt of Comer & Co. was a pretended debt, and that Comer & Co., with actual notice of the insolvent condition of the Baums, received the liens and mortgages upon which they rely; that the defendants deliberately bought a large stock of goods on credit, with the intent not to pay for

them; that they deliberately schemed and planned to get an immense stock on hand, and, confederating with Comer & Co., created the preferences and liens above mentioned, which covered the entire stock of goods, as well as all other property owned by the defendants, and that in these frauds Comer & Co. participated. Plaintiffs insist that at the time of the failure of the Baums their financial condition was as follows:

| | |
|---|---|
| Merchandise, as indicated by the receiver's inventory at ten per cent. above invoice price,   -   -   -   - | $ 31,457 91 |
| Notes and accounts collected by the receivers thereafter up to March 1, 1889,   -   -   -   -   -   - | 5,522 85 |
| Real estate, at their own valuation, -   -   -   - | 10,000 00 |
| Amount of all other notes, accounts, and old *fl. fas.*, which are regarded by the receiver as being wholly worthless, - | 39,080 42 |
| Aggregating assets of   -   -   -   -   -   - | 86,061 18 |

### LIABILITIES.

| | |
|---|---|
| Secured debts proved before the master,   -   -   - | $ 54,702 00 |
| Unsecured creditors who proved their debts before the master, | 29,841 39 |
| Total liabilities,   -   -   -   -   -   -   - | 135,702 00 |

—showing that the Baums were wholly unable to pay $49,640.83, and upon their own showing were insolvent to that amount. It appears, however, from the report of the receivers that by the most diligent efforts they have been able to collect less than $30,000 of the alleged assets of more than $80,000, from which it is apparent that the Baums at the time of their failure were absolutely in debt for more than $100,000. This is an enormous degree of insolvency for a business like that of the Baums, carried on in the small villages of Toomsboro and Irwinton. The plaintiffs insist that the secret contract between the Baums and Comer & Co. was a fraud to give to the Baums a delusive credit, or that it had that effect. It is in evidence that the fact of its secret character, and that subsequent creditors had no knowledge of its existence, enabled the Baums to purchase large quantities of goods in fraud of the vendors and to the advantage of Comer & Co.; that in May, 1888, after this agreement on the part of the Baums to execute a mortgage to Comer covering their entire property whenever they should become financially embarrassed, the Baums stated to Bradstreet that they were worth in the neighborhood of $30,000 over and above all their liabilities, that there were no incumbrances whatever upon their property, and that their annual business amounted to about $75,000. In November the failure came, to the amount of $150,000 with $30,000 of assets covered with mortgages to Comer & Co., and with second mortgages on the same stock to other persons for about $30,000.

. The solicitors for Comer & Co. rely, of course, upon the report, and insist, by virtue of the mortgage and assignments of choses in action to their clients, they are entitled to take the entire fund, or so much thereof as will fully discharge their indebtedness. The solicitors for the plaintiffs object to this, for the important reasons: (1) Whether the Baums are guilty of fraud or not, that the execution of the several mortgages, which the plaintiffs insist were all made as part of a scheme to

dispose of the entire estate, to avoid the laws of the state relative to assignments, and were, in legal contemplation, an attempt to make an assignment, and, failing to comply with any of the requisites of the statutes, they are void, and the preferences must be disregarded. (2) The plaintiffs insist that the master erred in his finding that the Baums were guilty of no fraud in the statement to the Bradstreet Commercial Agency and to the credit agent of Claflin & Co. They insist that they were then wholly insolvent; that they knew their condition, and misrepresented it, and as the consequence defrauded people who sold them goods for credit. (3) They insist that Comer & Co. must have known the financial condition of the Baums at the time of the secret agreement in March, and, if so, to withhold that agreement from the knowledge of the public was to give to the Baums a delusive credit to the advantage of Comer & Co., who had this agreement to mortgage, and to the injury of subsequent creditors. That if, as a consequence of this secret agreement, loss must ensue to one of two persons dealing with the Baums, it must fall upon that person concerned in the secret arrangement, and not on him who was not aware of its existence. As a consequence they insist that Comer & Co., who were at fault, should be made to bear the loss. (4) They insist that, as the Baums obtained the goods of Fechheimer & Co. and Comer & Co. by fraud and misrepresentation, they got no title, and, having no title, that Comer's mortgage did not attach, and should not therefore take the proceeds of their goods, which they insist were sufficiently identified. (5) They insist further that the mortgage executed to Comer & Co. on the 13th of November was made to secure a debt pre-existing at the time of the purchases, and for that reason that it should not attach as against their right to recover the purchase money. There are other questions made by the report and the exceptions thereto, but the decision must be controlled by those above stated.

Do the several mortgages covering the entire property of the Baums and the assignment of their choses in action to Comer constitute such an attempt to avoid the law of the state as to voluntary assignments as to justify the law to declare this invalid for failure to comply with the statute? The plaintiffs direct the attention of the court to the mortgage of November 13, 1888, covering all the merchandise and real estate given to secure a series of old notes, many of which were then overdue, with a power of sale authorizing Comer & Co. to sell the mortgaged property on 10 days' notice, execute title to the purchaser, apply the proceeds to their debts, with 10 per cent. attorneys' fees, and pay over the surplus, if any, to the mortgagors or their assigns; also to the assignment of choses in action aggregating $50,000; also a mortgage on November 17th, similar to that of November 13th, covering certain other merchandise that had been omitted in the first mortgage; also to the fact that on November 13th, the date of their first mortgage to Comer & Co., the Baums executed, as appears from the dates of the mortgages themselves, 17 other mortgages covering the same property already mortgaged to Comer, all of which latter mortgages are identical in form, and given to secure debts to the amount of $28,130.70, with 10 per

cent. additional in attorneys' fees. Great stress is laid upon the fact that all of these mortgages contained power of sale, with direction to apply proceeds to the debts due the mortgagees, with this notable clause: "The surplus, if any, to be paid over to our creditors." Attention is called to the fact that there was no equity of redemption left by these latter mortgages, and it is insisted that there was an absolute appropriation of the property to the mortgagees, or, as the plaintiff insists, to the assignees. Was this an assignment for the benefit of creditors? The statute of the state upon this subject can be found in the act of the general assembly of Georgia of 1884, p. 100. This act provides: In all cases where voluntary assignments are made by failing or insolvent debtors for the benefit of their creditors it shall be the duty of the firm, person, or corporation making such assignment to comply with certain technical requisites of the act, such as annexing a schedule of the debts, etc. These statutes are very strictly construed by the decisions of the state appellate court against the debtor and his assignee; and, when the instrument of assignment is not prepared in compliance with the statute, it is invariably declared to be null and void as an assignment. It is proper, at this point of the discussion, to state that the policy of the law of Georgia authorizes preferences by insolvent debtors to creditors, Code, § 1953, providing as follows:

"A debtor may prefer one creditor to another, and to that end he may *bona fide* give a lien by mortgage or other legal means, or he may sell in payment of the debt, or he may transfer negotiable papers as collateral security, the surplus in such cases not being reserved for his own benefit or that of any other favored creditor, to the exclusion of other creditors."

The last clause has been held to be repealed by the act of 1866, and the surplus may now be controlled to other favored creditors. *Powell* v. *Kelly*, 82 Ga. 1, 9 S. E. Rep. 278. The argument of plaintiffs' solicitors, that the mortgage of Comer & Co. and the mortgages of the 17 other mortgagors were drawn the same day, and that, while the equity of redemption was preserved in the former, the latter mortgages had no such feature, but, on the contrary, provided that the surplus should be distributed to the general creditors. They insist that the entire series of conveyances bearing date November 13, 1888, shall be construed together as indicating the purpose of the makers, and the disposition to dispose of the entire property by a voluntary assignment. They insist, what seems to be indisputable, that the indebtedness of the Baums referred to in the conveyances of that date, November 13, 1888, aggregate $66,130.70 principal, besides interest and 10 per cent. attorneys' fees. This is exclusive of Comer & Co.'s exclusive mortgage of November 17, 1888. Thus they had, as the plaintiffs insist, appropriated their entire assets to the payment of certain preferred creditors having claims aggregating nearly three times the value of their assets. They insist this is an assignment. The plaintiffs lay stress on *White* v. *Cotzhausen*, 129 U. S. 329, 9 Sup. Ct. Rep. 309. That case resulted from an attempt by a creditor to secure an illegal preference in the face of a statute which was enacted to secure absolute equality among the creditors of an insolvent

debtor, the language of the law being: "Every provision in any assignment providing for the payment of one debt or liability in preference to another shall be void, and all debts and liabilities within the provision of the assignment shall be paid *pro rata* from the assets thereof." "The main object of this legislation," said Mr. Justice HARLAN in rendering the opinion of the court, "is manifest. It is to secure equality of right among the creditors of the debtor who makes a voluntary assignment of his property." This is widely variant, as we have seen, from the law of Georgia. We gather from the opinion just cited that, in Illinois, a debtor, when financially embarrassed, may in good faith compromise liabilities, sell or transfer property in payment of his debts, or mortgage or pledge it as security for debts, or create a lien upon it by means even of a judgment confessed in favor of his creditors. This language has reference to the action of the debtor while he retains dominion over his property; "but when," as announced in what Justice HARLAN terms the 'leading case' upon this subject in the supreme court of Illinois, (*Preston* v. *Spaulding*, 120 Ill. 208, 10 N. E. Rep. 903,) "he reaches the point where he is ready and determines to yield the dominion of his property, and makes an assignment for the benefit of his creditors, under the statute, this act declares that the effect of such assignment shall be the surrender and conveyance of all his estate not exempt by law to his assignee,—rendering void all preferences, and bringing about the distribution of his whole estate equally among his *bona fide* creditors; and we hold that it is within the spirit and intent of the statute that when the debtor has formed a determination to voluntarily dispose of his whole estate, and has entered upon that determination, it is immaterial into how many parts the performance or execution of his determination may be broken,—the law will regard all acts having for their object and effect the disposition of his estate as parts of a single transaction, and, on the execution of the formal assignment, it will, under the statute, draw to it, and the law will regard as embraced within its provisions, all prior acts of the debtor having for their object and purpose the voluntary transfer or disposition of his estate to or for creditors; and, if any preferences are shown to have been made or given by the debtor to one creditor over another in such disposition of his estate, full effect will be given the assignment, and such preferences will, in a court of equity, be declared void, and set aside as in fraud of the statute."

If that were the law of Georgia, we should be obliged, in our judgment, to adopt the reasoning of the plaintiffs' solicitor, and be governed thereby. Is it true, however, that to obtain equality between the creditors of an insolvent debtor is the purpose of legislation in the state? It is clearly otherwise. This appears, not alone from the language of the statute, but from repeated and the latest decisions of the supreme appellate court of the state. We have seen that the Code provides: "A debtor may prefer one creditor to another, and to that end he may, *bona fide*, give a lien by mortgage or other legal means, or may sell in payment of the debt, or he may transfer negotiable papers as collateral security." Section 1953. In the case of *Powell* v. *Kelly*, 82 Ga. 1, 9 S. E.

Rep. 278, a case decided long after the enactment of the assignment act upon which the plaintiffs rely, the supreme court holds:

"The act does not prescribe any particular manner or form in which a debtor may prefer one creditor to another. In our opinion he may do it by an assignment of all his property to one creditor or a class of creditors," etc.

The court then proceeds to meet the argument that the preference therein described would be a virtual repeal of the policy of the legislature in regard to assignments, and says: "These acts, [meaning the statutes upon which plaintiffs here rely,] as will be seen by reference thereto, apply only to assignments," etc. In that case the preference was made by a sale to the preferred creditors of a part of the debtor's property, and the other portion was sold to other creditors. It follows logically, as the purpose of the law of Illinois was wholly different as to preferences from the law of Georgia, a decision in *White* v. *Cotzhausen* is not to be regarded as controlling upon the question in controversy here. The mortgage to Comer & Co. was made in consequence of a promise by the Baums to give them a preference in case of subsequent embarrassment. It was made and delivered before the remaining mortgages were executed. Comer & Co. for themselves had carefully provided against the financial embarrassments which now surrounded their debtors, and the laws of Georgia are not in conflict with the ancient and salutary maxim, "*vigilantibus non dormentibus jura subveniunt.*" "It is not to be disputed," says Mr. Justice WOODS, (*Blennerhassett* v. *Sherman*, 105 U. S. 100,) "that, except as forbidden by the bankrupt law, a debtor has the right to prefer one creditor over another, and that the vigilant creditor is entitled to the advantage secured by his watchfulness and attention to his own interest."

It is insisted, however, by the plaintiffs that the mortgage to Comer & Co. is void as creating a preference, because it contains a provision that the surplus, if any, after satisfaction of the debt is to be returned to the mortgagors, the Baums. It is sufficient, in reply to this proposition, to cite the case of *Calloway* v. *Bank*, 54 Ga. 441, in which we find that "where one in failing circumstances made a mortgage with a power of sale, on which he procured money to be loaned to him, and the power of sale provided that if the property brought more at the sale than the debt, the surplus was to be reserved to the mortgagors, it is held that this was not such a reservation of a trust or benefit to the mortgagor as made the mortgage and power of sale fraudulent. Judge McCAY, delivering the opinion, says: "The surplus in such a case is no benefit to himself. The land is subjected to his creditors." See, also, *Lay* v. *Seago*, 47 Ga. 82. Upon this point we must overrule the objections to the mortgage.

It is further insisted by the plaintiffs that what they term the secret agreement of March 10th, by which Comer & Co. received the promise of the Baums to prefer them, was a fraud on other creditors to the extent that it was withheld from the record, and that the Baums were thus given a delusive credit, thus enabling them to obtain the goods of the plaintiffs without either the ability or the intention of paying for them. This instrument is nothing more than an agreement to prefer in case of

insolvency. The law of Georgia authorizing an insolvent debtor to prefer a creditor, it is difficult to perceive why a promise to prefer in itself can be regarded as the beginning of fraud. Great reliance is placed by the plaintiffs upon the case of *Blennerhassett* v. *Sherman*, 105 U. S. 100, as authority to support their view of this transaction. But it is easy to distinguish that case from this. There an instrument, a mortgage, by the law should have been recorded, but was withheld from record. Here the instrument was merely a promise to give a mortgage, and there is no provision of the state law for the record of such a paper. It has been held by the supreme court of this state that the registration of such conveyances only as are required by law to be registered is constructive notice to all subsequent purchasers. *Williams* v. *Logan*, 32 Ga. 165. It follows, therefore, to have registered this paper would have been a nullity. The agreement in question between Comer & Co. and Baum & Co., had it been merely in parol, Comer & Co. having performed their part of the contract, would have been as valid as if in writing. We know of no obligation which requires Comer & Co. to publish such an agreement had with one of their customers. In *Blennerhassett* v. *Sherman*, the creditor, to use the language of the court, actively concealed the mortgage, and represented the debtor as having a large estate and unlimited credit. Nothing of the sort appears here. In the case of *Neslin* v. *Wells*, 104 U. S. 428, the single question was whether, under the laws of Utah in force at that time of the transaction, a junior mortgage, taken without notice, actual or constructive, of a prior mortgage, is to be preferred in its lien to a mortgage prior in execution but subsequently recorded. Mr. Justice MATTHEWS for the court held that 'there arose a duty on the part of Neslin, the vendor, to record his purchase-money mortgage towards all who might become subsequent purchasers for value in good faith, a breach of which in respect to Kerr, the subsequent mortgagee without notice, constitutes such negligence and laches as in equity requires that the loss, which in consequence thereof must fall on one of the two, shall be borne by him by whose fault it was occasioned. Not only, therefore, does it appear that Comer & Co. had no opportunity to register this paper, but that if registered it would have been a nullity as a notice; and, it not appearing that they had any purpose to participate in any subsequent fraud of the Baums on other parties, it must be registered merely as a vigilant effort on their part to provide for possible insolvency of that firm, in whose solvency they were so deeply concerned. To repeat the language of Mr. Justice WOODS in *Blennerhassett* v. *Sherman*, *supra*, "it is not to be disputed that a debtor has the right to prefer one creditor over another, and that a vigilant creditor is entitled to the advantage secured by his watchfulness and attention to his own interests;" and, conceding that this is in effect, as insisted by plaintiffs, an unrecorded mortgage, they are met by the following announcement immediately succeeding that just quoted: "Neither can it be denied that the mere failure to record a mortgage is not a ground for setting it aside for the benefit of subsequent creditors, who have acquired no specific lien on the property described in the mort-

gage." After careful consideration, we sustain the master's report on all grounds with reference to the mortgages of Comer & Co. They are entitled to be paid principal and interest from the fund in the custody of the court.

It is objected that they are not entitled to attorneys' fees. This, however, was a part of the contract expressed in the mortgage, and is as valid as any other stipulation therein. This precise question has been decided by the supreme court of Georgia in the case of *McCall* v. *Walter*, 71 Ga. 287, nor does it matter that the mortgage was not foreclosed. Comer & Co. having been enjoined, the court took jurisdiction of the whole matter, and their mortgage will be considered as foreclosed by the decree here.

With reference to the mortgage executed by the Baums to Comer & Co. on November 17th, we think it merely an attempt to perfect the original mortgage, it being intended to cover certain merchandise which had been omitted from the first because it was not in the store.

With reference to the assignment of choses in action aggregating some $50,000, executed on November 16, 1888, by the Baums to Comer, with a power to collect, compromise, or settle the same, and apply the proceeds to his indebtedness, it is insisted by the plaintiffs that this is a voluntary assignment, and should have been made in compliance with the law of Georgia relative to such assignment. To secure the debt for which the mortgages to Comer & Co. were given, the Baums, on the 16th day of November, executed a written assignment, which contains this language:

"We hereby assign and transfer unto them all book-accounts, notes, and mortgages now in our possession, and belonging to us, including those belonging and appertaining to the business now being done by us at Toomsboro, in Wilkinson Co., and Dublin, in Lawrence Co., the aggregate amount of which is about fifty thousand dollars, more or less, a correct list of which we agree to furnish said H. M. Comer & Co. as soon as practicable, to be hereunto attached."

Comer & Co. were given the power to make such compromises of these notes and accounts as they thought proper, to pay the proceeds on their debt, and to return to the Baums such accounts, notes, and mortgages as may remain uncollected. This, in our judgment, is a voluntary assignment by a debtor who has parted with the custody of all the remainder of his property, and who was known to the assignees to be insolvent. It is therefore an assignment in the meaning of the act of September 28, 1881, and, not being accompanied by the sworn schedule and statement of assets required by the statute, it must be declared void, and the sums collected by the receiver from such choses in action as were included in this assignment will be distributed to the creditors of the Baums under the usual rule.

With reference to all those mortgages which contain a clause that the surplus existing after the payment of the debts due the mortgagees therein mentioned shall be paid over to the creditors of the mortgagors, they are, in our judgment, likewise voluntary assignments for the bene-

fit of creditors. They come fully up to the rule laid down in Burrill on Assignments, § 6. They constitute an absolute appropriation of the property for the payment of the debts of the creditors of the Baums. None of them contain any reservation of the equity of redemption. They pass, therefore, both the legal and the equitable title beyond the control of the assignor, and the persons accepting them, had they been technically perfect as assignments, would have assumed the trust to collect any resulting surplus, and disburse the same to the indebtedness of the Baums. *Martin* v. *Hausman*, 14 Fed. Rep. 160; *Clapp* v. *Dittman*, 21 Fed. Rep. 15. A Georgia case precisely in point is *Coggins* v. *Stephens*, 73 Ga. 414. There the conveyance was made in consideration of $870, "a part of which was to be paid to Silvey & Dougherty, and the remainder to debts, I, Faulkner, am owing." Coggins, on the execution of this instrument, took possession of the property, paid off a mortgage *fi. fa.* which had been levied thereon, and certain other debts. The supreme court held this transaction to be a voluntary assignment by Faulkner to Coggins in trust that Coggins would pay his debts, and that as an assignment it was void because not in compliance with the technical requisites of the statute. This wise and salutary law, the court says, when invoked, should be enforced according to its express terms, and in a liberal spirit, to suppress the evil at which it aims a blow. In *Crittenden* v. *Coleman*, 70 Ga. 293, we held that this act must be liberally construed in favor of creditors and strictly against the debtor and his assignee. These mortgages, which we hold as constituting voluntary assignments conformably to the law, must be held invalid, and the court will inquire, if it becomes necessary to do so, as to the existence of the alleged debts they were nominally given to secure. It is by no means satisfied from the evidence that such debts existed.

With reference to the mortgage of S. Waxelbaum the master made no finding thereon. It stands upon an independent footing, and, if not settled by consent of the parties, will be disposed of by the court in accordance with its equities.

The court is unable to assent to the finding of the master that the Baums were guilty of no fraud in the purchases from Fechheimer & Co. and Claflin & Co. Upon this subject it is sufficient to say that the evidence has not removed the impression which was formed by the court and announced in the decision granting an injunction and appointing a receiver. It is however true that the evidence offered by the plaintiff does not sufficiently, in the opinion of the court, identify and distinguish the goods so purchased as to justify an order for recaption. This holding is perhaps not very important to the parties in view of the small amount which will probably remain after the mortgages of Comer & Co. receive their share of the fund in the hands of the court. The court is not satisfied from its consideration of the evidence with the measure of identification upon which the solicitors have thought proper to rely.

In consideration of the premises, it will be decreed that the mortgages of Comer & Co., principal, interest, and attorneys' fees, shall be paid, as far as that fund will suffice, from the proceeds of the sale of the prop-

erty upon which the lien of such mortgages attached, after certain charges thereon hereafter to be indicated. The 17 mortgages which have been decided to constitute an assignment void under the statute will be so declared, and the right of the alleged mortgagees thereof to participate as general creditors will be, if necessary, further examined. The assignment of choses in action hereinbefore mentioned as likewise void under the statute will be so declared, and the sum heretofore or hereafter collected on such choses in action will be distributed among the creditors. Messrs. Patterson & Hodges, solicitors for complainants, whose bill brought the fund into the custody of the court, and by whose professional labors all the general creditors will have been benefited, will be accorded from such fund appropriate compensation for their services, in accordance with the precedent fixed in *Railroad* v. *Pettus*, 113 U. S. 116, 5 Sup. Ct. Rep. 387. This will be 5 per cent. on the entire fund collected by the receivers.

This being an equity cause, in which the question of liability of cost is one for the discretion of the court, the costs will be assessed in accordance with what appears to be the equities of the case as affecting cost. That Fechheimer & Co. were grossly defrauded, there can be, in the opinion of the court, no doubt. The statement to Bradstreet by the Baums, that their property was unincumbered at a time when they were under a written private promise to Comer & Co. to execute a mortgage for every farthing of its value, was the grossest fraud. It is true that the evidence does not connect Comer & Co. with that fraud, but they must have known that the Baums were buying goods largely on credit; and they also knew that in case of possible, and it is not an extreme statement to say probable, collapse of the latter that the private agreement in their possession would utterly deprive subsequent creditors of the opportunity to recover the purchase price of their goods. It was the private agreement, then, which was the occasion of the great losses of Fechheimer & Co. and Claflin & Co., for it is not to be supposed that merchants of character and intelligence would give credit to men who had obliged themselves to prefer a particular creditor to the extent of their entire estate. This, indeed, is the evidence. The plaintiffs were wholly justified in filing their bill. They knew nothing of the secret agreement. It was this secret agreement to prefer, and the preference made in consequence thereof, which has in large measure defeated their recovery of the greater portion at least of their demands. Under all of these facts, upon which we have been compelled to maintain these preferences, to express the sense of the court of the injuries to the mercantile community by contracts of this secret nature, it is in the judgment of the court its duty to assess all the costs save the charge against the fund for Patterson & Hodges against the Baums and against H. M. Comer & Co. jointly and severally, and it will be decreed accordingly.