### Neslin *v*. Wells.

1. By the laws of Utah in force in the year 1873 a mortgage of lands which is
   first recorded, if it be taken without notice of an elder mortgage, is entitled
   to precedence of lien.
2. It is only when the equities are equal that the maxim *qui prior est tempore potior
   est jure* applies.

Appeal from the Supreme Court of the Territory of Utah.
The facts are stated in the opinion of the court.

*J. G. Sutherland* and *J. R. McBride* for the appellant.

*Mr. Samuel Shellabarger* and *Mr. Jeremiah M. Wilson* for
the appellees.

Mr. Justice Matthews delivered the opinion of the court.

This is a suit of an equitable nature, brought by Wells,
Fargo, & Co., against Neslin and Smith, in the District Court
of the Third Judicial District of the Territory of Utah, to
foreclose a mortgage of real estate, made by Smith to Kerr, and
by the latter assigned to them. Neslin claimed to be a prior
mortgagee of the same land, and to be entitled to a lien pre-
ferable to that of the complainants.

A decree for the complainants was rendered in the District
Court, establishing their mortgage as the first and best lien.
A motion for a new trial was made by Neslin. On that mo-
tion, a statement in writing, agreed upon as correct, was signed
by the attorneys for both parties, and filed and made part of

the record. It embraces the proceedings on the trial, including all the testimony, and also the findings of the court, as to matters of fact, and its conclusions of law, specially and separately stated, together with the decree.

The motion for a new trial was overruled, and Neslin appealed to the Supreme Court of the Territory, from the order overruling the motion and from the decree. The Supreme Court affirmed the decree, to reverse which Neslin prosecutes this appeal.

Under the second section of the act of Congress of April 7, 1874, c. 80 (18 Stat., pt. 3, p. 27), concerning the practice in territorial courts and appeals therefrom, as explained in *Stringfellow* v. *Cain* (99 U. S. 610), the present appeal rightly brings into review the decree of the Territorial Supreme Court, affirming the decree of the District Court; but we are not at liberty to consider anything as embraced in the statement of facts, required by the statute, except the special findings of the District Court, adopted by the Supreme Court in its general judgment of affirmance. This excludes the consideration of the exceptions taken in the District Court in the course of the trial, and noted in the statement filed in that court as the basis of the motion for a new trial, and leaves as the sole question for determination here, whether the facts as found justify the decree sought to be reversed.

The facts thus found and stated are as follows : Smith being indebted to Wells, Fargo, & Co. in the sum of $17,107.10, executed and delivered to them his promissory note for that amount, dated July 5, 1873, having, upon an agreement to indemnify John W. Kerr, procured him to indorse the note as surety. In pursuance of that agreement Smith made and delivered to Kerr, Sept. 27, 1873, his promissory note for $13,000, secured by mortgage on land in Salt Lake City, and Kerr assigned it to Wells, Fargo, & Co. as collateral security for the note of Smith held by them. In consideration whereof, Wells, Fargo, & Co. gave to Kerr additional time for payment of the note. It was then overdue, and no part of it has been paid. Neither Kerr nor Wells, Fargo, & Co. had any notice, actual or constructive, of any prior liens on the land at the time when they respectively received the mortgage. It was recorded in

the records of Salt Lake County, Sept. 29, 1873, at 8 o'clock, A. M.

On July 5, 1873, and prior thereto, Smith was in possession of the mortgaged premises. He continued in possession until after the maturity of the note for $13,000, when he surrendered them to the complainants.

On Nov. 27, 1872, Smith executed and delivered to Neslin a note for $7,000, and a mortgage to secure the same on the same premises described in the mortgage to Kerr, being for the unpaid purchase-money therefor, the same having been sold and conveyed by Neslin to Smith by deed duly executed and delivered. This mortgage to Neslin was recorded in the records of Salt Lake County, on Sept. 29, 1873, at twenty-five minutes past noon. No part of this mortgage debt has been paid.

As a conclusion of law, the court found that the lien of the mortgage to Kerr was entitled to priority over that of the mortgage to Neslin.

This conclusion, which is assigned as error, we are now to examine.

It presents the single question whether, under the laws of Utah in force at the time of the transaction, a junior mortgage taken without notice of a prior mortgage, actual or constructive, and first recorded, is to be preferred in its lien to a mortgage prior in execution but subsequently recorded.

Prior to the organization of the territorial government of Utah, which was effected by an act of Congress approved Sept. 9, 1850, the people dwelling there, who had set up a government under the name of the State of Deseret, passed an ordinance providing for the election of county recorders. It made it their duty to provide themselves with good and well-bound books, suitable for the purpose, and record therein all transfers or conveyances of land or tenements, and all other instruments of writing and documents suitable, necessary, and proper to be recorded, in a fair and legible manner ; and also books for the purpose of recording town and city plats, and plats of all surveys of land, roads, and surveys of public works, whenever the same shall be permanently located ; and these books of record were required to

be indexed in alphabetical order, and were declared to be " free to the examination of all persons," and upon the filing of any paper for record the recorder was required to indorse upon the back thereof the time of receiving it.    Comp. Laws of Utah, 130.

A law on the same subject and in similar terms was passed by the territorial legislature Jan. 19, 1855.    Comp. Laws of Utah, 131.

The settlement of the Territory by inhabitants having preceded the establishment by Congress of the legal organization of the territorial government, and the survey and opening to sale of the public lands, early provision was made for ascertaining and defining the possessory rights of those who, unable to obtain title as against the government, nevertheless had appropriated and improved portions of land.    By a territorial law passed June 18, 1855 (Laws of Utah, 1851–70, p. 93), a form was prescribed for the transfer and conveyance of these land claims, as they were called, and it was declared that, to be valid, a transfer must be witnessed by two or more competent persons; be acknowledged before some person authorized to take acknowledgments; be recorded, and the record, page and book, be certified thereon by the recorder in the county where the property is located.    It is also therein provided that other property than land claims, when disposed of by gift, must be transferred substantially in the same manner, and by specification of kind and number or amount, but unless required the details may be omitted.

The Civil Practice Act of Feb. 17, 1870, sects. 272 and 273, provides that on the hearing of a case for the partition of real property the plaintiff shall produce to the court the certificate of the recorder of the county where the property is situated, showing whether there were or not any outstanding liens of record upon the property, or any part thereof, at the time of the commencement of the action; and if by such certificate, or by the verified statement of any person who may have searched the records, that there were such liens of record at the time of the commencement of the action, and the persons holding them have not been made parties thereto, it is made the duty of the court either to order such persons to be

made parties, by an amendment to the pleadings, or to appoint a referee to ascertain whether such liens or incumbrances have been paid, or if not, what amount remains due thereon, and the order in which they are severally held by such persons and the parties to the action. Those who become parties, if they claim a lien by mortgage, judgment, or otherwise, are required to set forth among other particulars the amount and date of the same; and provision is made for notice to those not made parties to appear before the referee and make proof of their claims. It is also provided that no persons who have or claim any liens upon the property, by mortgage, judgment, or otherwise, need be made parties to the action, unless such liens be matters of record; and immediately after filing his complaint the plaintiff is required to file with the recorder of the county a notice of the pendency of the action, containing the names of the parties, the object of the action, and a description of the property to be affected thereby, which, from the time of the filing, it is declared shall be deemed notice to all persons. In case of a sale for purposes of partition, it is also provided (sect. 299) that the conveyance shall be recorded in the county where the premises are situated, and that it shall be a bar against all persons interested, parties to the action.

These are all the statutory provisions in force within the Territory at the time of the transaction involved in this suit; and they continued so to be until the passage of an act on Feb. 20, 1874, concerning conveyances, which regulates the whole subject, and specifically provides " that every conveyance of real estate within this Territory hereafter made, which shall not be recorded as provided in this act, shall be void as against any subsequent purchaser, in good faith and for a valuable consideration, of the same real estate, or any portion thereof, when his own conveyance shall be first duly recorded." This, however, cannot affect the rights of the parties in this controversy, for they had been fixed by the law previously in force.

The legislation on the subject prior to 1874, it will be observed, did not require that a mortgage should be recorded in order to be valid, and did not in terms declare what should be the legal effect of recording or omitting to record it.

That legislation cannot, however, be assumed to be without

significance, and its precise meaning must be determined, not only by what it expresses, but by what it necessarily implies.

There can be no reasonable doubt, we think, that the records which the county recorder is bound to keep, which private persons are authorized to employ for recording their instruments and evidences of title, and which the public have a right to inspect, have all the qualities that attach to public records. Such books are mentioned by Greenleaf (1 Greenl. Ev., sect. 484) as of that description which are recognized by law, because they are required by law to be kept, because the entries in them are of public interest and notoriety, and because they are made under the sanction of an oath of office, or, at least, under that of official duty; and "books of this public nature, being themselves evidence, when produced, their contents may be proved by an immediate copy, duly verified;" it being a rule, considered as settled, "that every document of a public nature, which there would be an inconvenience in removing, and which the party has a right to inspect, may be proved by a duly authenticated copy."

It is a mere corollary from this datum that these records are, by construction of law, notice to all persons of what they contain. Their contents are matters of public knowledge, because the law requires them to be kept, authorizes them to be used, and secures to all persons access to them, in order that the knowledge of them may be public, and, therefore, imputes to all interested in it that knowledge the opportunity to acquire which it has provided. The law assumes the fulfilment and not the defeat of its own ends. It will not permit its policy to be gainsaid, not even by a plea of personal ignorance of its existence or extent. It will not allow, therefore, any man to say that he does not know that of which the law itself says it has informed him. The provisions of the law in reference to these records either have no purpose at all, — which we have no right to assume, — or their purpose was, that the public might have knowledge of the titles to real estate of which they are the registers. It would utterly defeat that purpose not to presume with conclusive force that the notice which it was their office to communicate had reached the party interested to receive it; for, if every man was at liberty to say he had

failed to acquire the knowledge it was important for him to have, because he had not taken the trouble to search the record which the law had provided for the express purpose of giving it to him, then the ignorance which it was the public interest and policy to prevent would become universal, and the law would fail because it refused to make itself respected.

In this country, differing in that respect from the ruling of the English courts, it is uniformly held that the registration of a conveyance operates as constructive notice to all subsequent purchasers of any estate, legal or equitable, in the same property. The doctrine is founded on the obvious policy of the registry acts, the duty of the purchaser under such circumstances to search for prior incumbrances, the means of which search are within his power, and the danger of letting in parol proof of notice or want of notice of the actual existence of the conveyance. Story, Eq. Jur., sect. 403.

And the principle applies as well in cases where the conveyances are merely authorized as where they are required by law to be registered.

In *Pepper's Appeal* (77 Pa. St. 373, 377), decided under a statute of Pennsylvania declaring that assignments of mortgages *may be* recorded in the office for the recording of deeds, &c., and that the record of such instrument shall be as good evidence as the original, it was held that, although the recording of an instrument was discretionary, the record is nevertheless notice to a subsequent assignee. After reviewing various statutes of the State on the subject, the court say: " Thus it appears that the language of the Acts of Assembly providing for the recording of written instruments has not generally been mandatory. When recorded, however, we do not understand the effect thereof is in any respect lessened by the absence of an imperative command to record. It is optional whether or not to record. When the election is made, and an instrument authorized by law to be recorded is actually recorded, all the incidents and force of a public record attach to that record. It is an early and well-recognized principle that one great object in spreading an instrument of writing on a public record is to give constructive notice of its contents to all mankind."

It is a further inference which we are judicially bound to make, that records so carefully provided by law, and so useful, were in fact the common resort of the community whose dealings in real estate they were meant to register; that the practice of recording conveyances and incumbrances of the title to land, for the purposes of evidence and of information to those who might be affected by them, and the habit of searching the records in order to obtain that knowledge, was general and usual; that such practice and habit had become so common, that men of ordinary prudence in the management of important concerns affecting their own interests would expect to conform to it themselves, and would act upon the expectation that others of that character would do so likewise. In point of fact this presumption is verified in the present case, the majority of the judges in the court below declaring in their opinion that, at the times when the mortgages in question were executed, it was a common thing, and of public notoriety, to record mortgages and other conveyances.

The statutes under consideration, it is true, do not in express terms make it obligatory upon one taking a conveyance of or incumbrance upon real estate to record it. The recording is not made essential to its validity as between the parties; nor is it declared that the failure to record shall postpone its operation in favor of a subsequent *bona fide* purchaser for value without notice. And yet the implication is very strong that the latter effect must be intended by it. Otherwise what valuable and sufficient purpose is there in construing the record to be constructive notice of its contents, except to protect such a purchaser? If, without recording, the conveyance is not only valid between the parties, but good also as against the world, with or without notice, of what public value or use is the provision for keeping such a record and declaring it to be public, open to the examination of all persons? On that supposition its only purpose would be, in the private interest of proprietors, to furnish a convenient and cheap mode of supplying proof, by certified copies, in case of the loss or destruction of title-papers. But even that purpose is not expressly declared. It is only an inference based on the nature of the record as

public, and the objects which, under the system of registration adopted in this country, in colonial times, and which has since prevailed universally in all the States, have been sought to be attained by it. The chief of these is to secure that publicity in respect of the transfer of titles which, in the earlier history of the common law, was effected by livery of seisin, and, later, by the substituted enrolment of conveyances by way of bargain and sale; and which had in view, as its principal purpose, the protection of innocent purchasers from frauds which might be practised by means of secret conveyances.

To hold otherwise would be to declare that land should cease generally to be the subject of sale; for no amount of diligence on the part of a purchaser would insure his title. He would, of course, demand of the vendor an inspection of his title-deeds. From them he would learn the chain of title. A production and examination of the deeds made in the common form would show by their recitals that none of the preceding owners could have any claim for unpaid purchase-money, for the receipt of it, in each instance, is usually contained in the deed. He would, therefore, reasonably deem it unnecessary to make any personal inquiry, and in respect to supposed incumbrances in favor of strangers he would be compelled to rely upon the statements of the vendor. Who would be willing, or could afford, to purchase under such circumstances, if after every reasonable effort to inform himself of possible incumbrances a mortgagee holding an incumbrance of prior date, and whose failure to give such public notice of the fact as the law had furnished the means of giving had betrayed him into the purchase, should nevertheless be permitted to supersede his title, by asserting a paramount lien? Certainly there would be no injustice, and we think no violation of legal principle, in such circumstances, in preferring over his claim that of the innocent party, who otherwise would suffer loss, occasioned by a fraud which his laches alone had made effective.

But coupling together the obvious purposes of the recording acts in question, and the necessary implications arising thereon, with the general and notorious practice of the people of the territory under them, we have no hesitation in deciding that, under the circumstances of this case, there arose a duty on the

part of Neslin, the vendor, to record his purchase-money mortgage, towards all who might become subsequent purchasers for value in good faith, a breach of which, in respect to Kerr, the subsequent mortgagee, without notice, constituted such negligence and laches as in equity requires that the loss, which in consequence thereof must fall on one of the two, shall be borne by him by whose fault it was occasioned.

An apposite illustration of the principle involved in this conclusion is found in *Ellis & Morton* v. *Ohio Life Ins. & Trust Co.*, 4 Ohio St. 628. It was there held that, while ordinarily money paid by a banker in payment of a forged check purporting to be drawn upon him by a depositor, to a holder for value, cannot be recovered back, as paid under a mistake of fact, because he is supposed to know the signature of his own customers, yet that the rule does not apply when, either by an express agreement, or a settled course of business between the parties, or a general custom of the place, the holder takes upon himself the duty of exercising some material precaution to prevent the fraud, and by his negligent failure to perform it has contributed to induce the drawee to act upon the paper as genuine, and to advance the money upon it. In that case, a custom was proved whereby a bank, to whom was offered a check, drawn upon another, by a stranger, was expected and required not to receive it, without requiring the party offering to identify himself as the true owner.

It was decided that the existence of that custom imposed upon the defendants in that case a duty towards the plaintiff, which the latter was entitled to rely upon as performed; and that a breach of that duty constituted negligence, which, if it resulted in a loss to another, the law would cast upon the party in fault. In delivering the opinion of the court, Ranney, J., said: " Nor is it anything remarkable or unusual that such an obligation should arise from a settled course of business between the parties, or be established by the proof of a custom ; or that the holder, for his negligent failure to regard it, be deprived of rights which he would otherwise be entitled to demand. . . . When the defendants purchased this check, they knew full well that it deprived the plaintiffs of the ability to make this part of the investigation, and that it would be paid to them

without any examination whatever; and if the custom really exists, they must have known equally well that in afterwards passing upon the genuineness of the paper the plaintiffs would have a right to rely, as an important element in forming a conclusion, upon the supposition that the defendants had made the investigation and were satisfied with the result."

Similar effect was given to the existence of a known custom, in creating an obligation, in *Whitbread* v. *Jordan* (1 You. & Coll. 303), where Lord Lyndhurst held that the creditor of a publican in London, who took from the latter a legal mortgage, knowing that he was indebted to his brewers, and was aware of the ordinary practice in London of publicans depositing their leases with their brewers by way of mortgage, must be postponed to the security of a brewer who had obtained the title-papers by way of equitable mortgage, on the ground that the existence of the custom put him on inquiry, so as to constitute constructive notice of the prior equity.

In *Luch's Appeal* (44 Pa. St. 519), it was decided, overruling some remarks of Gibson, C. J., to the contrary, in *McLanahan* v. *Reeside* (9 Watts (Pa.), 508), that although the registry laws of Pennsylvania did not expressly prescribe that deeds and mortgages should be recorded in separate sets of books for each class or conveyance, that, nevertheless, a division of subjects and books of record had become legalized by necessity and practice upon the registry system, so as to render it available to present and future generations; and that, consequently, the record of a mortgage in a book kept for the record of deeds was not notice to a subsequent purchaser. The court, after reviewing the history of the practice, said: "It is clear, therefore, from uniform practice, going back so far as to be equivalent in this country to an immemorial usage, that mortgages are and must be recorded in mortgage books, and are of course not properly recorded in any other species of book where they cannot be found by means of the mortgage indexes."

And conversely it was held in *Colomer* v. *Morgan* (13 La. Ann. 202), that a record of a deed in a book of mortgages "does not convey the information required by the statute," and is, therefore, not effectual notice.

The rule to be applied here is merely an extension of that

declared by Lord Chancellor Macclesfield in *Savage* v. *Foster* (9 Mod. 35, 37), — " When anything in order to a purchase is publicly transacted, and a third person knowing thereof, and of his own right to the lands intended to be purchased, and doth not give the purchaser notice of such right, he shall never afterwards be admitted to set up such right to avoid the purchase; for it was an apparent fraud in him not to give notice of his title to the intended purchaser; and in such case infancy or coverture shall be no excuse; . . . neither is it necessary that such infant or *feme covert* should be active in promoting the purchase, if it appears that they were so privy to it, that it could not be done without their knowledge."

When the public records of conveyances operate as notice of the state of the title to all intending purchasers, it must be that their existence and common use is notice as well to all prior purchasers and incumbrancers, that others will rely upon it as well as themselves; and that to withhold from the record conveyances or incumbrances in their own favor is a waiver of their right, and equivalent to a representation that they do not exist, in favor of innocent subsequent purchasers, who otherwise would be wrongfully affected by them. It is a case for the application of the maxim, *idem est non esse et non apparere*.

It applies to cases of negligence as well as of fraud, for the injurious consequences of both are not distinguishable. It was stated by Lord Romilly, Master of the Rolls, in *Briggs* v. *Jones* (Law Rep. 10 Eq. 92, 98), in this comprehensive form: " A person who puts it in the power of another to deceive and raise money must take the consequences. He cannot afterwards rely on a particular or a different equity." It was applied by Vice-Chancellor Kindersley in *Rice* v. *Rice* (2 Drew. 73, 83), as between a vendor, asserting his equitable lien for unpaid purchase-money, and a subsequent equitable mortgagee by deposit of title-deeds. In deciding the case he said, what is very pertinent in the present: " The vendors, when they sold the estate, chose to leave part of the purchase-money unpaid, and yet executed and delivered to the purchaser a conveyance by which they declared, in the most solemn and deliberate manner, both in the body of the deed and by a receipt indorsed,

that the whole purchase-money had been duly paid. . . . Thus they voluntarily armed the purchaser with the means of dealing with the estate as the absolute legal and equitable owner, free from every shadow of incumbrance or adverse equity. . . . The defendant, who afterwards took a mortgage, was in effect invited and encouraged by the owners to rely on the purchaser's title. They had, in effect, by their acts, assured the mortgagee that, as far as they (the vendors) were concerned, the mortgagor had an absolute title both at law and in equity."

See also *Waldron* v. *Sloper*, 1 Drew. 193 ; *Dowle* v. *Saunders*, 2 Hem. & M. 242 ; *Perry Herrick* v. *Attwood*, 2 De G. & J. 21 ; *Darnell* v. *Hunter*, Law Rep. 11 Eq. 292 ; s. c. Law Rep. 7 Ch. Ap. 75.

The rule applies in favor of the superior equity of a junior mortgagee, even in cases where the prior mortgage conveys the legal estate. Ordinarily the priority between incumbrances is determined by their quality, as each successive conveyance passes only what title remains after satisfying those which precede it. The first mortgage conveys the legal estate ; the second, merely an equity of redemption ; and as equity follows the law, and the owner of the legal title, by means of it, has a legal right, after condition broken, to the possession and a remedy at law for acquiring it, he is entitled to priority. A mortgage, however, in equity, at the present day, has almost ceased to be regarded as a conveyance of an estate, and is considered rather as merely a lien upon the estate of the mortgagor, the tendency of the modern law being to look upon it simply as a security for the payment of a debt or duty. Such, indeed, is an express statutory provision in Utah, sect. 260 of the Civil Practice Act of Feb. 17, 1870, enacting that "a mortgage of real property shall not be deemed a conveyance, whatever its term, so as to enable the owner of the mortgage to recover possession of the real property without a foreclosure and sale." Under this provision all mortgages, without respect to their relative dates, are legal liens, and priority cannot attach to the earlier in date by reason of the superior dignity of the estate conveyed. The rule, therefore, that gives preference to the legal title has no application, and the priority

among them must be determined by purely equitable considerations.

The only circumstance on which the appellant can rest the claim of his mortgage to a preference over that of the appellee, is that it is prior in date.    But the maxim quoted in support of this claim — *qui prior est tempore potior est jure* — only applies in cases in which the equities are equal.    That, we have already decided, is not this case.    Here equity cannot be satisfied otherwise than by subjecting the appellant to the loss, which has to be suffered by one of the two solely in consequence of his own fault.

Some question was made in argument as to whether the appellees were holders of the mortgage to Kerr for a valuable consideration.    But the findings of the court, which are conclusive as to the facts, leave no room for doubt upon the legal conclusion.

We find no error in the decree, and it is accordingly

*Affirmed.*