Jane Fuller JACKSON, a/k/a Jane Fuller Morris, Appellant

v.

**WILDFLOWER PRODUCTION COMPANY, INC., Appellee**

No. 07-15-00070-CV

Court of Appeals of Texas, Amarillo.

October 13, 2016

---

82

Aubrey J. Fouts, for Wildflower Production Company, Inc.

George A. Whittenburg, Mitchell G. Ehrlich, for Jane Fuller Jackson.

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

## OPINION

Patrick A. Pirtle, Justice

This appeal involves conflicting claims of ownership pertaining to an oil and gas royalty interest and right of reversion, as it pertains to certain real property located in Wheeler County, Texas. Appellant, Jane Fuller Jackson, claims ownership of the property in dispute by virtue of a *Mineral Deed Without Warranty* dated November 23, 1993, which was recorded ten days later on December 3, 1993. Appellee, Wildflower Production Company, Inc., claims ownership of those same property interests by virtue of a *Mineral Deed Without Warranty*, from the same grantor, dated seven days later on November 30, 1993,

and recorded on December 14, 1993.[1] Both deeds purport to convey, in part, the same property interests, being the property in controversy. Following a bench trial, the trial court found that Wildflower acquired a "superior claim of title" by virtue of being an innocent purchaser for value without actual or constructive notice of Jackson's ownership interest. Jackson contends that Wildflower is not entitled to the protections of an innocent purchaser for value because it acquired its interest by means of a quitclaim deed. Wildflower contends that Jackson waived this claim by failing to assert that argument to the trial court; and, it further contends that, in any event, the conveyance document in question was not a quitclaim deed because it conveyed property, not just the grantor's interests in the property.

Finding that Jackson did not waive her claim that Wildflower acquired its interest in the property in controversy via a quitclaim deed and that Wildflower did, in fact, acquire its interest by that means, we conclude the trial court erred in finding Wildflower acquired its interest without notice of the earlier conveyance. Accordingly, we reverse and render, in part, and reverse and remand, in part.

### BACKGROUND

On September 14, 1972, R.P. Fuller and wife, Lloyd Elaine Fuller, executed a deed conveying an undivided one-fourth interest in all of the oil, gas, and other minerals in and under and that may be produced from two tracts of land situated in Wheeler County, Texas, to their three children, Rex Fuller, Ann Fuller Cope, and Jane Fuller Jackson. The first tract contained 121.86 acres and the second tract contained 155.4 acres, for a total acreage of 277.26 acres,

---

1. Although the deed to Wildflower was recorded subsequent to the recording of the deed to Jackson, that fact is not determinative of any issues in this case.

more or less.[2] Jackson's undivided one-twelfth interest (one-third of one-fourth) in the oil, gas, and other minerals in and under and that may be produced from this acreage is the property in controversy in this case.

On April 7, 1977, the three Fuller children and others, executed an *Oil, Gas & Mineral Lease* covering these two tracts in favor of W.R. Gray & Associates. The lease was for a primary term of three years and as long thereafter as oil, gas, or other minerals were produced from the property. The lease provided for the payment of a three-sixteenth (3/16) royalty, proportionately reduced to the interest owned by each party. The lease also contained a pooling clause authorizing the formation of a 640-acre unit for the production of gas. W.R. Gray & Associates subsequently assigned the lease to Grace Petroleum Corporation, who then executed a *Designation of Gas Unit*, placing the mineral interests the subject of the earlier lease into a gas unit known as the No. 1 C.A. Stein Unit. Thereafter, the lease became a part of a pooled unit. Under the terms of the pooling agreement, all royalties were payable in proportion to the acreage each tract bore to the total acreage in the 640-acre unit. During the primary term of the lease, a gas well (the "Stein Well") was drilled and completed within the pooled unit.

On June 15, 1990, Rex Fuller, Jackson, Lydick-Jackson Joint Venture, and others, as grantors, executed a deed of trust in favor of John C. Sims, as Trustee for the First National Bank at Lubbock,[3] to secure payment of a debt in the original principal amount of $1,000,000. That same day, Cope, Lydick-Jackson Joint Venture, and others, as grantors, also executed a deed of trust in favor of Sims, as Trustee for the Bank, to secure an indebtedness in the original principal amount of $250,000. The two deeds of trust encumbered the ownership interests of the grantors in vari-

---

2. The deed from R.P. and Lloyd Elaine Fuller to their three children described the property as follows:

First Tract: Being a part of the Thomas James 1/3 League of land, described by metes and bounds as follows:
BEGINNING At the NW corner of the J.F. Alexander tract out of the SE corner of said Thomas James Survey; THENCE North 9 deg. 46 min. East 1336.55 feet to point for corner; THENCE East 1110.3 feet to a point for corner; THENCE North 1320 feet to a point for corner; THENCE East 1401.7 feet to a point on the West line of Section No. 1, Cert. 75, C & M RR Co. Survey, for the Northeast corner of this tract; THENCE South with the West line of said Section No. 1, Cert. 75, C & M RR Co. Survey, 2640 feet to a point on the west line of said Sec. 1, Cert. 75, C & M RR Co. Survey, and a point on the East line of Thomas James 1/3 League of land for SE corner of this tract; THENCE West 2721.7 feet to the place of beginning, and containing 121.86 acres of land.

Second Tract: Being a part of Section 1, Cert. 75, Abst. No. 112, original grantee, C & M RR Co. Patent No. 171, Vol. 55, dated October 23, 1880, described by metes and bounds as follows:
BEGINNING At the NE corner of the J.F. Alexander 160 acre tract of land out of the South part of said Sec. 1, C & M RR Co. Survey; THENCE West 2558.3 feet to a point for the SW corner of this tract; THENCE North 2640 feet to a point for the NW corner of this tract; THENCE East 2558 feet to a point for the NE corner of this tract on the East boundary line of Sec. 1, Cert. 75, C & M RR Co. Survey; THENCE South 2640 feet to the East line of said Sec. 1, Cert. 75, C & M RR Co. Survey, to the place of beginning, containing 155.4 acres of land;
Both tracts containing 277.26 acres of land, more or less, and situated in Wheeler County, Texas.

3. First National Bank at Lubbock was subsequently known as the First National Bank of West Texas. For purposes of this opinion, we will refer to the entity simply as the "Bank."

ous tracts of real property located in the following Texas Counties: Carson, Lipscomb, Wheeler, Hemphill, Hansford, Ochiltree, Fayette, Archer, Roberts, Reeves, Brazoria, Hutchinson, Hockley, Cochran, and Moore. Although the legal description used in the two deeds of trust did not track the legal description of the 277.26 acres described in the deed from R.P. and Lloyd Elaine Fuller to their three children, all parties agree that the property interest described in the deeds of trust encompassed Jackson's property interest in that acreage. On September 7, 1993, as a result of a subsequent default in payment on the notes secured by the two deeds of trust, the Bank foreclosed upon the grantor's property interests in the various tracts of property. FBGA Financial Services, Inc., the Bank's nominee and agent, purchased the property for the benefit of the Bank and received a separate Substitute Trustee's Deed with respect to each deed of trust.

Prior to foreclosure, the Bank had agreed to not seek a deficiency judgment against any of the Fuller children, and subsequent to the foreclosure, Leete Jackson III, Jane Fuller Jackson's husband, consummated an arrangement with the Bank to purchase her former interest (being the property in controversy) from the interest the Bank obtained through foreclosure. Pursuant to that agreement, on November 23, 1993, FBGA executed and delivered a quitclaim instrument, entitled *Mineral Deed Without Warranty*, conveying to Leete the Bank's interest in the property in controversy.[4] In this document, the 277.26 acres were described by the same metes and bounds description used in the September 14, 1972 deed from R.P. Fuller and Lloyd Elaine Fuller to their

children. This instrument was subsequently recorded in the official property records of Wheeler County on December 3, 1993.

During this same period of time, the Bank was also negotiating with Rex to sell some of the property interest the Bank intended to acquire at foreclosure. Relevant to this dispute, Rex consummated those negotiations by agreeing with the Bank that Wildflower, a corporation owned and controlled by Rex, would purchase a portion of the property interest the Bank obtained through foreclosure of the two deeds of trust. Pursuant to that agreement, on November 30, 1993, FBGA executed and delivered to Wildflower an instrument entitled *Mineral Deed Without Warranty*, purporting to convey to Wildflower whatever property interest the Bank acquired through foreclosure in and to all or part of seven sections of property located in Wheeler County, Texas. This instrument was subsequently recorded in the official property records of Wheeler County on December 14, 1993, and provided, in relevant part, as follows:

> FBGA Services, Inc., ... does hereby grant, bargain, sell, convey, transfer, assign and deliver unto WILDFLOWER PRODUCTION COMPANY, INC., ... a portion of the Grantor's right, title, interest, estate, and every claim and demand, both at law and in equity, in and to that part of the oil, gas and other minerals in and under and that may be produced from the following described lands situated in Wheeler County, State of Texas, being more particularly described in Exhibit "A" attached hereto and made a part hereof for all purposes whatsoever, being that interest previously owned by ANN FULLER LYDICK CLAYTON aka ANN FULLER aka

---

4. Leete Jackson III, died November 2, 1997. Jane Fuller Jackson claims ownership of his interests by way of inheritance.

MARGARET ANN FULLER aka ANN FULLER LYDICK aka MARGARET FULLER LYDICK aka ANN FULLER COPE aka MARGARET ANN COPE and LYDICK-JACKSON JOINT VENTURE aka COPE-JACKSON JOINT VENTURE ... and JANE JACKSON FULLER aka FRANCES JANE FULLER aka FRANCES JANE JACKSON ..., together with the right of ingress and egress at all times for the purpose of mining, drilling, exploring, operating and developing said lands for oil, gas and other minerals, and storing, handling, transporting and marketing the same therefrom with the right to remove from said land all of Grantee's property and improvements.

The acreage described in Exhibit "A" included the 277.26 acres previously deeded to Leete. Although Exhibit "A" did not include the specific metes and bounds description used in the deed to Leete, it does include the description of a larger tract which encompasses that acreage.[5] As a result of these two instruments, the Bank transferred its interest in the 277.26 acres twice—first to Leete and subsequently to Wildflower. This apparently inadvertent double-deeding of that acreage is the genesis of the dispute in this case.

At trial, conflicting testimony was given as to whether Rex was aware that the Bank had already transferred the mineral interest formerly owned by Jackson to Leete when he negotiated the purchase of the remaining mineral interest by Wild-

flower. John C. Sims, the Bank's attorney who drafted the November 23, 1993 deed to Leete,[6] testified that prior to the execution of the deed to Wildflower on November 30, 1993, Rex was aware that Leete had previously acquired the mineral interest formerly owned by Jackson and that Rex knew Wildflower would not be acquiring that interest. On the other hand, Rex testified that he did not know about the November 23, 1993 deed until June of 2011.

From 1993 until 2011, Wildflower received and consistently accepted, without exception or objection, royalty payments from the Stein Well based upon a property interest that did not include the mineral interest formerly owned by Jackson. Furthermore, the record reflects that from 2002 until 2011, Jackson received royalty payments from the Stein Well in an amount equal to the exact mineral interest Leete had purchased from the Bank pursuant to the November 23, 1993 deed.[7]

In 2010, Linn Energy, Inc. started a drilling program on real property included within the 640-acre Stein Unit. Pursuant to that program, Linn Energy drilled, completed, and began production on another gas well (the "Stein 1-3H Well"). A division order title opinion pertaining to the Stein 1-3H Well, prepared in January of 2011 by legal counsel for Linn Energy, raised for the first time an issue with respect to the ownership of the mineral interest purchased by Leete, being the property in

---

5. The property description in Wildflower's deed tracks the property description in the Substitute Trustee's Deed; whereas, the property description in Leete's deed tracks the deed from R.P. Fuller and Lloyd Elaine Fuller. Although different property descriptions were used, the parties agree both deeds purport to convey the property in controversy.

6. Despite the striking similarity of the deeds, Sims testified that he did not prepare the

November 30, 1993 deed to Wildflower Production. According to Sims's testimony, Rex Fuller brought the Wildflower deed with him to the closing.

7. The record is unclear as to who received royalty payments from the Stein Well during the period from November 23, 1993 until 2002.

controversy. Because the November 23, 1993 deed to Leete was not recorded until after execution of the November 30, 1993 deed to Wildflower, the title examiner required both parties to agree and sign off on a stipulation concerning their respective interests.

When agreement could not be reached, Wildflower filed suit pursuant to the Uniform Declaratory Judgments Act,[8] contending it was the rightful owner of the property in controversy by virtue of being an innocent purchaser for value, without notice of any existing claim to the property. Wildflower sought a declaration that it solely owned the disputed property and that the November 23, 1993 deed to Leete was void. It also sought recovery of reasonable and necessary attorney's fees. By her *Original Answer*, Jackson sought a counter-declaration that she owned superior title by virtue of the earlier deed. She also sought recovery of her reasonable and necessary attorney's fees.

Prior to trial, the parties stipulated that the only fact issues to be determined were: (1) whether Wildflower had actual or constructive notice of the November 23, 1993 deed to Leete, on November 30, 1993, and (2) whether Wildflower Production was a "bona fide purchaser of the interest in dispute." The parties presented evidence and arguments to the court on February 10, 2014. At the conclusion of the hearing, the court gave counsel an opportunity for additional briefing and took the matter under advisement. On January 8, 2015, the court entered judgment finding that the November 30, 1993 deed to Wildflower conveyed "superior title in the mineral/royalty interest conveyed." The Final Judgment entered also

stated, albeit incorrectly, that the deed to Wildflower was recorded *prior* to the deed to Leete. On January 28, 2015, the court entered *Findings of Fact and Conclusions of Law*, wherein it correctly found that the Wildflower deed was recorded *subsequent* to the deed to Leete. Additionally, the court found that Wildflower paid value for the disputed property and that it acquired that property "without notice, actual or constructive, of the conveyance to Leete Jackson, III." In further support of its judgment, the court concluded that the November 30, 1993 deed to Wildflower was not a quitclaim deed and that Jackson had waived any claim that the conveyance was a quitclaim deed by failing to include "an issue related to the character of the conveyance" in the stipulation agreed to by the parties.[9] Jackson filed a timely notice of appeal.

## ISSUES PRESENTED

Jackson contends the November 30, 1993 deed to Wildflower is a quitclaim deed, as a matter of law, and that the trial court erred in finding otherwise. She also contends the trial court erred, as a matter of law, in finding that she waived her claim that the deed to Wildflower was a quitclaim deed. Wildflower contends its deed is not a quitclaim deed, although it concedes that construction of the deed is a question of law. Wildflower also contends the trial court did not err in finding the deed in question to be a conveyance of title rather than a quitclaim deed.

## CONVEYANCES

■ In Texas, interests in real property transfer upon execution of an instrument of conveyance evidencing the grantor's intent to convey, executed and legally delivered to the grantee. By statute, an instru-

---

8. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001-37.011 (West 2015 and Supp. 2016).

9. The stipulation of the parties was not made in open court and entered of record, nor does it appear in the clerk's record.

ment of conveyance must be in writing and must be subscribed and delivered by the grantor or the grantor's agent. Tex. Prop. Code Ann. § 5.021 (West 2014).[10] Three common instruments of conveyance are at issue in this case: (1) deeds, (2) quitclaim deeds, and (3) mineral leases.[11]

> For a deed or instrument to effect conveyance of real property, it is not necessary to have all the formal parts of a deed formerly recognized at common law or to contain technical words. If, from the whole instrument, a grantor and grantee can be ascertained, if there are operative words or words of grant showing an intention of the grantor to convey title to a real property interest to the grantee, and if the instrument is signed and acknowledged by the grantor, it is a deed that is legally effective as a conveyance.

*Masgas v. Anderson*, 310 S.W.3d 567, 570 (Tex. App.–Eastland 2010, pet denied).

An instrument of conveyance of an interest in real property conveys a fee simple estate unless the estate is limited by express words or unless a lesser estate is conveyed or devised by construction or by operation of law. § 5.001(a). An absolute or "fee simple" estate is one entitling the owner to the benefits of that estate during his life and descending to his heirs, devisees, and legal representatives on his death. *Field v. Rudes*, 204 S.W.2d 1, 4 (Tex. Civ. App.–El Paso 1947), *rev'd on*

*other grounds*, 146 Tex. 133, 204 S.W.2d 5 (1947). One can own a fee simple estate in both legal and equitable property interests. *Id.* Since February 5, 1840, words previously necessary at common law to transfer a fee simple estate have not been necessary. § 5.001(a), (b). Texas courts have long recognized that "the form of the instrument is of no moment if it manifests the intention of the grantor to convey to the grantee the entire title by the very terms of the instrument itself." *Baker v. Westcott*, 73 Tex. 129, 11 S.W. 157, 158 (1889); *White v. Brookline Trust Co.*, 371 S.W.2d 597, 599 (Tex. Civ. App.–Amarillo 1963, writ ref'd n.r.e.) (holding that "inaccuracy of expression or the inaptness of the words used in the instrument are not fatal if the intention to pass title can be discovered from a careful consideration of the instrument as a whole and the surrounding circumstances, or the instrument manifests by its term the intention of the grantor to convey to the grantee").

## DEEDS V. QUITCLAIM DEEDS

As already stated above, title to real property (whether fee simple or otherwise) transfers upon execution of a document evidencing the grantor's intent to convey, executed and legally delivered to the grantee. Both deeds and quitclaim deeds convey the grantor's interest in the property described to the grantee. What typically distinguishes a deed from a quitclaim deed is that the granting clause in a deed

---

10. "A conveyance of an estate of inheritance, a freehold, or an estate for more than one year, in land and tenements, must be in writing and must be subscribed and delivered by the conveyor or by the conveyor's agent authorized in writing." Tex. Prop. Code Ann. § 5.021 (West 2014). Unless otherwise designated, all references to "section" or "§" are to the Texas Property Code.

11. Texas law has long recognized that an oil and gas lease is not a "lease" in the traditional sense of a lease of the surface of real

property. *Natural Gas Pipeline Co. of America v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003). Rather, "[i]n a typical oil and gas lease, the lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee." *Id.* (citing *W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 28–29 (Tex. 1929)). As a result, the lessee/grantee acquires ownership of all the minerals in place that the lessor/grantor owned and purported to lease. *Id.*

purports to grant and convey the described property, whereas the granting clause in a quitclaim deed only purports to grant and convey whatever "right, title, and interest" the grantor has in that property at the time the instrument is executed and delivered. *See Cook v. Smith*, 107 Tex. 119, 174 S.W. 1094, 1095 (Tex. 1915) (holding that a quitclaim deed conveys whatever interest the grantor owns without warranting or professing that the title is valid); *Geodyne Energy Income Prod. P'ship I–E v. Newton Corp.*, 161 S.W.3d 482, 485 (Tex. 2005); *Enerlex, Inc. v. Amerada Hess, Inc.*, 302 S.W.3d 351, 354 (Tex. App.–Eastland 2009, no pet.); *South Plains Switching v. BNSF Ry. Co.*, 255 S.W.3d 690, 707 (Tex. App.–Amarillo 2008, pet. denied).

Effectively, a quitclaim deed is only a release and assignment of the grantor's claims to the property because it contains no covenant of seisen or representation of title in the grantor.[12] *Diversified, Inc. v. Hall*, 23 S.W.3d 403, 407 (Tex. App.–Houston [1st Dist.] 2000, pet. denied). By itself, a quitclaim deed does not establish any title in the grantee but instead merely passes the interest of the grantor in the property described. *Rogers v. Ricane Enters.*, 884 S.W.2d 763, 769 (Tex. 1994). "A quitclaim deed does not *of itself* establish any title in those holding under it. The quitclaim passes the interest of the grantor in the property, and for the quitclaim to be a conveyance, title in the grantor must be shown." *Abraham v. Crow*, 382 S.W.2d 756, 758 (Tex. Civ. App.–Amarillo 1964, no writ) (quoting *McMahon v. Fender*, 350 S.W.2d 239, 240 (Tex. Civ. App.–Waco 1961, writ ref'd n.r.e.) (emphasis in original)). In other words, for a quitclaim deed to serve as a conveyance of title, the grantor must hold title to the property itself.

Typically, a quitclaim deed is used when the interest of the grantor is unknown or uncertain and the grantor wants to limit or extinguish potential liability arising from any claim the grantee might assert against the grantor pertaining to the grantor's ownership interest. "Quitclaim deeds are commonly used to convey 'interests of an unknown extent or claims having a dubious basis,'" such as an interest acquired by virtue of a sheriff's deed or a trustee's deed following foreclosure. *See Geodyne*, 161 S.W.3d at 486 (quoting *Porter v. Wilson*, 389 S.W.2d 650, 654–55 (Tex. 1965)). *See also Hall*, 23 S.W.3d at 407 (constable's deed conveying "all of the estate, right, title and interest which the said [judgment debtor] had" found to be a quitclaim deed).

The nature of a given instrument as a conveyance of property versus a conveyance of the grantor's interest only is to be determined from the intent of the grantor as determined by the "four corners" of the document and the circumstances surrounding its execution and delivery. *Brookline Trust Co.*, 371 S.W.2d at 599 (stating that the "inaccuracy of expression or the inaptness of the words used in the instrument are not fatal if the intention to pass the title can be discovered from a careful consideration of the instrument as a whole and the surrounding circumstances"). In deciding whether an instrument conveys the property itself or merely

---

**12.** A covenant of seisin is an assurance to the grantee that the grantor actually owns the property being conveyed, in the quantity and quality which he purports to convey, and it is breached. if the grantor does not own the estate that he undertakes to convey. *Reyes v. Booth*, No. 11–00–00391–CV, 2003 WL 21663708, at *2, 2003 Tex. App. LEXIS 6148, at *2 (Tex. App.–Eastland March 27, 2003, no pet.) (mem. op.). In the absence of any qualifying expression, a covenant of seisin is read into every conveyance of land or an interest in land, except a quitclaim deed. *Id.*

the grantor's rights in that property, courts seek to determine the intent of the parties. *Geodyne,* 161 S.W.3d at 485; *Enerlex,* 302 S.W.3d at 354. What is important and controlling is not whether the grantor actually conveyed title to the property, but whether the instrument purports to convey the property described or the grantor's interest in that property. *Enerlex,* 302 S.W.3d at 355 (citing *Am. Republics Corp. v. Houston Oil Co. of Texas,* 173 F.2d 728, 734 (5th Cir. 1949)); *Cook,* 174 S.W. at 1096.

■ If, when taken as a whole, the instrument discloses a purpose to convey the property itself, and not merely a transfer of the grantor's interest, it will be given the effect of a deed, even though it may have some characteristics of a quitclaim. Conversely, if the instrument, taken as a whole, indicates the grantor's intent to merely transfer whatever interest the grantor may own, it will be treated as a quitclaim deed.

### Texas Recording Statute

■ At common law, in cases in which equities were equal, the rule concerning superior title between adverse claimants of the same property was found in the Latin maxim *"qui prior tempore potior est jure,"* which means "he who is first in time is preferred in right." *Neslin v. Wells,* 104 U.S. 428, 441, 26 L.Ed. 802 (1881). At common law, there is no requirement that an instrument of conveyance be registered or recorded in order to effectuate a transfer of title. The necessity of registering or recording an instrument of conveyance, as well as its effect, is purely a creature of legislative prerogative.[13] In Texas, insofar as it pertains to the transfer of title to real property, this common law rule of not requiring recordation was partially abro-

gated by the enactment of the Texas recording system. Now found in the provisions of the Texas Property Code, section 13.001 provides, in part, as follows:

> (a) A conveyance of real property or an interest in real property or a mortgage or deed of trust is void as to a creditor or to a subsequent purchaser for a valuable consideration without notice unless the instrument has been acknowledged, sworn to, or proved and filed for record as required by law.

> (b) The unrecorded instrument is binding on a party to the instrument, on the party's heirs, and on a subsequent purchaser who does not pay a valuable consideration or who has notice of the instrument.

§ 13.001(a).

■ Under this "notice" system, which has been in place in Texas in one form or another since 1830, the grantee under a later deed will prevail over the grantee in a prior unrecorded deed of the same property, unless the subsequent purchaser had notice of the prior unrecorded conveyance. *See Houston Oil Co. v. Kimball,* 103 Tex. 94, 122 S.W. 533, 536 (Tex. 1909) (holding that, under the recording statute in effect in 1838, subsequent purchaser for value and without actual or constructive notice of prior conveyance held superior title over grantee of unrecorded prior deed); *Hall,* 23 S.W.3d at 406 (finding that holder of a later title will have priority over the holder of an earlier title if it is shown that the holder of the later title acquired it as an innocent purchaser for value without notice of the earlier interest). *See also Gibraltar Sav. Ass'n v. Martin,* 784 S.W.2d 555, 557 (Tex. App.–Amarillo 1990, writ denied) (finding that "[t]his statute, through various transmutations in enumer-

---

13. "Our system of registration was unknown to the common law. It is purely statutory." *Ball v. Norton,* 238 S.W. 889, 890 (Tex. Comm'n App. 1922, judgm't adopted).

ation, has been a part of our jurisprudence since before Texas was a state" and that previous statutes have been so similar in all material respects to the present statute as to make decisions under those predecessor statutes relevant to any current analysis). This notice system protects a subsequent purchaser who acquires an interest in real property without notice of a prior unrecorded conveyance. Under the Texas statute, a subsequent grantee who acquires an interest in real property by paying valuable consideration and who is without notice of the prior grant, does not have to record the subsequent conveyance in order to prevail over the prior grantee.

### EFFECT OF A QUITCLAIM DEED ON INNOCENT PURCHASER STATUS

 Since 1871, courts of this State have considered it "settled law" that a party receiving a quitclaim deed to land cannot avail himself of the defense of an innocent purchaser for value without notice. *See Richardson v. Levi*, 67 Tex. 359, 3 S.W. 444, 446 (1887) (recognizing the rule as being "first authoritatively announced" in *Rodgers v. Burchard*, 34 Tex. 441 (1871)). *See also Cook*, 174 S.W. at 1095–96. Because the grantee in a quitclaim deed receives only whatever right, title, interest, or claim the grantor had, "[a] quitclaim deed conveys upon its face doubts about a grantor's interest and a buyer is necessarily put on notice as to those doubts." *South Plains Switching Ltd.*, 255 S.W.3d at 707. As such, the grantee under a quitclaim deed is deemed to be on notice of all legal or equitable claims, recorded or unrecorded, existing in favor of a third-party at the time the quitclaim deed was delivered. *Woodward v. Ortiz*, 150 Tex. 75, 237 S.W.2d 286, 291–92 (1951); *Tate v. Kramer*, 1 Tex.Civ.App. 427, 23 S.W. 255, 257 (Tex. Civ. App.– Austin 1892, no writ) (holding that a quitclaim grantee is on notice of all other

claims to the property). The question is not one of being merely put on inquiry; the notice is absolute and conclusive as to all claims. Simply stated, as a matter of law, the grantee under a quitclaim deed takes the property subject to all adverse legal and equitable claims affecting title to the property and cannot be an innocent purchaser because the deed itself places the grantee on notice that there may be superior claims to title.

### BRYAN V. THOMAS

Wildflower relies heavily on the 1963 Texas Supreme Court opinion in *Bryan v. Thomas* to advocate its position that the instrument in question is not a quitclaim deed and that it is entitled to the status of an innocent purchaser for value. *See Bryan v. Thomas*, 365 S.W.2d 628 (Tex. 1963). As to the first position, Wildflower compares the granting clause of both instruments and concludes that because the granting clauses are similar, the instrument in question must be something other than a quitclaim deed simply because the instrument in *Bryan* was something other than a quitclaim deed. This is a logical fallacy. Just because the two deeds may contain similar wording does not alone mean that the deed in controversy is not a quitclaim deed.

 It is clear that the Supreme Court did not interpret the instrument in question in *Bryan* to be a quitclaim deed. *Id.* at 630 (stating "[t]he deed under consideration here from Mrs. Bryan to Thomas is *more than a quitclaim deed*" (emphasis added)). However, when comparing the conveyance instrument in *Bryan* to the conveyance instrument in this case, Wildflower ignores vital distinguishing characteristics. The most significant difference between the deed in this case and the deed in *Bryan* is that the deed in *Bryan* con-

tained a general warranty clause—an express guaranty of seisin. A covenant of seisin is an assurance to the grantee that the grantor owns the very estate in the quantity and quality which he purports to convey.[14] In *Bryan*, because the deed purported to convey all of the grantor's interest in a particular tract of land and because the grantor warranted title to that property, the court found that the instrument fairly implied an intent to convey the land itself—not just the grantor's rights in that property. As a result, the instrument in *Bryan* was held not to be quitclaim deed.

Despite this very clear distinction that *Bryan* was not dealing with a quitclaim deed, Wildflower then focuses in on a single sentence wherein Justice Culver wrote:

> [t]o remove the question from speculation and doubt we now hold that the grantee in a deed which purports to convey all of the grantor's undivided interest in a particular tract of land, *if otherwise entitled*, will be accorded the protection of a bona fide purchaser.

*Bryan*, 365 S.W.2d at 630 (emphasis added). Wildflower focuses on the language "purports to convey all of the grantor's undivided interest," and ignores the "if otherwise entitled" language. Notwithstanding the distinguishing fact that the deed in *Bryan* contained a warranty clause and the court found it to be something other than a quitclaim deed, Wildflower asks this court to accept the over-simpli-

fied proposition that the grantee in a deed that purports to convey "all of the grantor's undivided interest" is *ipso facto* entitled to the protections of an innocent purchaser. That simply is not what the court held in *Bryan*.

Since *Bryan*, courts and commentators have discussed and debated what the Supreme Court meant by the phrase "if otherwise entitled." *See* H. Martin Gibson, *The Perils of Quitclaims*, 25-4 Texas Oil and Gas Law Journal 1 (2011). Under Wildflower's interpretation, "if otherwise entitled" would have to refer to a subsequent grantee's superior position under the Texas Recording Statute. Under this interpretation, the *Bryan* opinion would have to be read as overruling over one hundred and thirty years of precedent, including the seminal 1915 case of *Cook v. Smith*, concluding that a quitclaim deed puts the grantee on notice of defects in the grantor's title. But this simply cannot be the case because the very next sentence in *Bryan* states that the court's opinion "finds full support in *Cook v. Smith*." 365 S.W.2d at 630.

In *The Perils of Quitclaims*, H. Martin Gibson posits an alternative interpretation that finds support by subsequent courts and commentators.[15] If the phrase "if otherwise entitled" is interpreted instead to refer to an instrument of conveyance that constitutes more than a mere quitclaim deed, then *Bryan* can be understood as highlighting the fact that the usage of

---

14. "[T]he intention of a covenant of seisin, as uniformly expounded in the English law, is only to indemnify the grantee for the consideration paid . . . ." *Wiggins v. Stephens*, 191 S.W. 777, 778 (Tex. Civ. App.–Amarillo 1917, no writ).

15. *See* F. Walter Conrad, *Property—Deeds—Notice—Quitclaim Redefined in a Restricted Manner for the Purposes of Notice under the Recording Acts*, 41 Tex. L. Rev. 939, 941-42 (1963) (stating "[t]he court in [*Bryan v. Thom-*

as] did not intend to confine its opinion to deeds involving only the phrase "undivided interest" but rather addressed itself to all deeds combining quitclaim language, such as "all my right, title and interest," with a general warranty clause or words of conveyance normally found in warranty deeds. The court said in effect that if an instrument contains such dual elements it will not be regarded as a quitclaim."

quitclaim-like granting language (such as "all of my right, title, and interest") is not the litmus test for determining whether a particular instrument is a quitclaim. In such instances, a court must delve deeper into the instrument itself to determine if there are other vestiges of a quitclaim— such as the absence of a covenant of seisin or a warranty of title. In *Bryan*, the court found other indicia of an intent to convey the land itself and, accordingly, found the instrument in question to be "more than a quitclaim deed," thereby entitling the grantee to the protections of an innocent purchaser. *See Porter*, 389 S.W.2d at 655 (holding that "[i]n cases where the courts have construed an instrument employing the words, 'all my right, title and interest' as one purporting to convey the land itself, they have found some wording in the instrument which evidenced an intention to convey the land itself rather than the right, title and interest of the grantor").

The language from *Bryan* relied upon by Wildflower has never been cited to support the proposition now being made— that a grantee in a quitclaim deed is entitled to the protections accorded an innocent purchaser.[16] Accordingly, we decline to follow the position being advocated by Wildflower based upon its interpretation of *Bryan v. Thomas*, and we adhere to the long-held principle that a quitclaim deed does not entitle a grantee to the protections of an innocent purchaser.

STANDARD OF REVIEW

■■■ Our analysis of the applicable standard of review in this case should begin with a discussion of the issue concerning whether Jackson waived her claim that Wildflower was not entitled to the protec-

tions of an innocent purchaser for value. In its *Findings of Fact*, the trial court found as follows:

7. The parties stipulated in an Agreement, pursuant to Rule 11 of the Texas Rules of Civil Procedure, that the only issues to be determined by the Court for the entry of a Final Decree in this proceeding were:

a. Whether Wildflower Production Company, Inc. had actual or constructive notice of the outstanding unrecorded conveyance to Leete Jackson, III at the time of the conveyance to Wildflower Production Company, Inc.

b. Whether Wildflower Production Company, Inc. was a bona fide purchaser of the interest in dispute.

The parties do not dispute this finding of fact. Where they disagree is with respect to the trial court's *Conclusions of Law* wherein the court found that Jackson "waived any claim that the conveyance to Wildflower Production Company, Inc. was a quit claim conveyance" as a result of this stipulation.

■■■ In reviewing the trial court's ruling, we afford great deference to its findings of fact, particularly if based on credibility determinations, when those findings are supported by the record. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). On the other hand, "[a] trial court's conclusions of law are always reviewable." *Tex. Student Hous. Auth. v. Brazos County Appraisal Dist.*, 440 S.W.3d 779, 786 (Tex. App.–Amarillo 2013), *rev'd on other grounds*, 460 S.W.3d 137 (Tex. 2015) (citing *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex.

---

**16.** In its fifty-three year history, *Bryan v. Thomas* has only been cited *one* time on the issue of whether a grantee was entitled to bona fide purchaser status. In *Penny v. Adams*, 420 S.W.2d 820 (Tex. Civ. App.–Tyler 1967, writ ref'd) the court held that the grantee in an instrument bearing "no legal distinction" to the deed in *Bryan* was entitled to bona fide purchaser status.

App.–Austin 1992, no writ)). Because a trial court has no discretion in determining whether to apply appropriate legal principles, we review a trial court's conclusions of law *de novo*. *See Okorafor v. Uncle Sam & Assocs.*, 295 S.W.3d 27, 38 (Tex. App.–Houston [1st Dist.] 2009, pet. denied). Because this standard controls when we review the trial court's legal conclusions, it controls the trial court's decision whether the instrument in question was a quitclaim deed. As such, it also controls the trial court's ultimate decision whether Wildflower was entitled to the protections of an innocent purchaser for value.

Here, because the parties agreed that the trial court would determine whether Wildflower was an innocent purchaser of the property in controversy, they implicitly agreed the trial court would determine whether the instrument in question was a quitclaim deed. Accordingly, because, as a matter of law, the trial court would have to determine whether the instrument in question was a quitclaim deed in order to determine Wildflower's innocent purchaser status, we conclude that Jackson did not waive that issue.

ANALYSIS

■ Based on the foregoing discussion of the law applicable to quitclaim deeds and innocent purchaser status, it is clear that the decision in this case turns squarely upon the construction to be given to the *Mineral Deed Without Warranty* from FBGA Services, Inc., as grantor, to Wildflower, as grantee, dated November 30, 1993. If that conveyance is a quitclaim deed, then Wildflower is not entitled to innocent purchaser for value status; whereas, if it is not a quitclaim deed, then it is entitled to avail itself of the benefits accruing from that status.

In the analysis of the instrument in question, if anything can be said with certainty, it would be that the instrument was poorly drafted. It is titled a "Mineral Deed Without Warranty," yet the body of the instrument does not expressly mention or discuss anything about whether the conveyance is or is not covered by a warranty of title. While the instrument does not conform to a typical quitclaim deed, it does have many characteristics that are common to such an instrument. The granting clause describes a "portion" of the grantor's "right, title, and interest" in and to a "part" of the oil, gas, and other minerals in and under and that may be produced from certain lands described in Exhibit "A," situated in Wheeler County, Texas. Furthermore, the instrument neither defines the "portion" nor the "part" conveyed other than to say that the interest described in Exhibit "A" was previously owned by Jackson and others. Missing is any express covenant of seisin or statement that the property interest described is actually owned by the grantor, FBGA. What the instrument does do is convey to the grantee whatever "right, title, interest, estate, and every claim and demand, both at law and in equity" the grantor might own. Other courts have described this language as "the essence of a quitclaim deed." *Ricane Enters.*, 884 S.W.2d at 769 (stating that a quitclaim deed is a deed of conveyance intending to pass any title, interest, or claim of the grantor, but not professing that the grantor owns title or that such title is valid). The quintessential character of a quitclaim deed is that the grantor makes no covenant of seisin—no representation or claim of ownership; instead, passing only what interest, if any, the grantor may have possessed.

Because the conveyance instrument from FBGA to Wildflower, when taken as a whole, (1) conveyed only "the Grantor's right, title, interest, and estate," (2) contained no covenant of seisin, (3) included no warranty of title, and (4) otherwise did

not express an intent to convey the property itself, we conclude it to be a quitclaim deed. Furthermore, because the instrument in question is a quitclaim deed, as a matter of law, Wildflower cannot avail itself of the protection afforded an innocent purchaser for value, without notice. *See Hall*, 23 S.W.3d at 407 (holding that grantee received nothing more than a chance at title because it received only whatever right, title, interest, or claim grantor had, which was nothing); *Woodward*, 237 S.W.2d at 291 (stating purchaser under a quitclaim deed could not enjoy protection of an innocent purchaser); *Smith v. Morris and Co.*, 694 S.W.2d 37, 39 (Tex. App.– Corpus Christi 1985, writ ref'd n.r.e.) (stating grantee in a quitclaim deed takes with notice of all defects in the grantor's title). Finally, because Wildflower is not entitled to the protections of an innocent purchaser for value, its interest in the property in controversy, if any, is subject to all existing claims.

Based on the above and foregoing, we find the trial court erred by construing the conveyance instrument in question as anything other than a quitclaim deed, and based on that conclusion, we find that, as a matter of law, Wildflower was not an innocent purchaser for value. Because the deed to Jackson was prior in time and, therefore, right to the deed to Wildflower, the trial court erred in finding that Wildflower had "superior title" to the property in controversy. We sustain Jackson's issues.

CONCLUSION

The judgment of the trial court is reversed and judgment is rendered declaring that Jackson owns and holds superior title to the property in controversy, including all oil, gas, and mineral interests in and under and that may be produced from the 277.26 acres described in the quitclaim

deed dated November 23, 1993 from FBGA, as grantor, to Leete Jackson III, as grantee. Because the trial court did not address additional relief requested by Jackson, this matter is further reversed and remanded to the trial court for the purpose of disposing of Jackson's claims concerning monies held in suspense and the recovery of reasonable and necessary attorney's fees pursuant to the applicable provisions of the Texas Civil Practice and Remedies Code.[17]

17. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2015).